See also, D.C., 99 F.R.D. 130.

**UNITED STATES of America, Plaintiff,**

v.

**STATE OF NEW YORK, William G. Connelie, Superintendent, New York State Police, Michael M. Ruddy, Daniel Voght, James W. Haker, Brendan Moran, Keith A. Gutbrodt, Donald J. Hudson, Jr., James C. Cox, Michael D. DiCamillo, and Edward K. Ludlum, Defendants.**

No. 77–CV–343.

United States District Court, N.D. New York.

Sept. 24, 1984.

David L. Rose, Kerri Weisel, Melissa Page Marshall, Attys., Civ. Rights Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff, U.S.

Robert Abrams, Atty. Gen. of the State of N.Y., Albany, N.Y., for defendants; Alan S. Kaufman, Judith I. Ratner, Asst. Attys. Gen., Albany, N.Y., of counsel.

### MEMORANDUM–DECISION and ORDER

JAMES T. FOLEY, Senior District Judge.

The issues in this action commenced in 1977 were decided after twenty-four (24) trial days by my decision of September 6, 1979. A final decree in accord with the rulings in such decision was filed October

become an agent for the target company and       benefit under this ruling.

19, 1979. The decision upon which the decree was based consisted of two hundred fifty-five (255) findings of fact and thirty-six (36) conclusions of law. A memorandum summarizing the issues, and emphasizing the importance and sensitivity of the case, and the reasoning for my rulings is reported in *United States v. State of N.Y.*, 475 F.Supp. 1103 (N.D.N.Y.1979). As stated therein, the action was instituted by the Attorney General of the United States alleging a "pattern and practice" of discriminatory employment practices with respect to black, Spanish-surnamed Americans and females in hiring New York State troopers in deprivation of their rights secured by specific federal statutes and the Fourteenth Amendment to the Constitution of the United States.

My judgment after careful consideration was that it was satisfactorily proven by the evidence that the past hiring practices of the New York State Police were in violation of Title VII of the Civil Rights Act of 1964, as amended, the Omnibus Crime Control and Safe Streets Act of 1968, as amended, the State and Local Fiscal Assistance Act of 1972, as amended. The state defendants were ordered to include in their future appointments to the position of New York State trooper qualified Negroes and Spanish-surnamed Americans totaling approximately 40% of each class until the total representation of such group of individuals approximately reflects their composition in the relevant New York State labor market, that is 10.80% and 3.36% respectively. With this determination, it was unnecessary to reach the claim based upon the Fourteenth Amendment. *United States v. State of N.Y.*, 475 F.Supp. at 1110. No appeal to the United States Court of Appeals, Second Circuit, from such decision and final decree was taken by either side of the lawsuit.

It may be worthwhile to repeat herein some of the statements in my published memorandum for they have bearing upon the motion now presented for decision that will be discussed hereinafter. My candid appraisal was noted that the decision was not an easy one because it raised emotional and complex issues touching upon the cross-cultural fabric of our society. Less than 1% of the New York State Police were Negro, Spanish-surnamed Americans, when the complaint was filed in 1977. The realization was expressed that there would be strong disagreement and resentment by many to the rulings made. The recognition was sought that personal interests at times have to be subordinated in order that important state and national interests can be properly served under controlling laws. The right of the State Police to hire only qualified troopers was upheld, and the New York State Police was described as a superior police force. My firm and sincere conviction that impelled the relief granted was expressed in these words:

> It is sincerely hoped that this decision will have a positive effect on the members of the New York State Police in their earnest efforts to overcome the unfair representation of minorities and women that exists presently in their ranks. In a democratic society, a police force that includes a reasonable proportion of members from the various groups of people that it serves will have a better image with the public, will better be able to carry out its law enforcement functions, and will ensure full and fair utilization of human resources without regard to color of skin, origin of birth, or gender. *United States v. State of N.Y.*, 475 F.Supp. at 1109.

Without any purpose of self-aggrandizement, it can be fairly stated that great strides have been made in the addition of minorities and females to the New York State Police since the entry of the final decree, October 19, 1979. In my elaborate decision of September 6, 1979, the important question of relief granted is fully discussed, (pp. 129–136). The recruitment efforts of the State Police undertaken voluntarily before the commencement of this action was recognized as a good faith effort to correct by its own actions the unfair representation of blacks and hispanics within its ranks. The court-ordered goal by fixed percentages of hiring minorities

was estimated to effect a fair representation of such groups in an approximate period of five years. The years that have transpired to the present have been marked by impressive and well publicized swearing-in ceremonies of qualified troopers with a presence of substantial numbers of blacks, hispanics and females being inducted. The attainment of the prescribed goal for representation approximating the percentage of the minority labor force in New York will soon be reached. The credit for this attainment must be accorded to the affirmative and continuing cooperation of the progressive Governors of New York State and the supervising officials and administrative staff of the New York State Police in the recruitment of minorities as mandated by the final decree. This court is grateful for this splendid attitude of respect for and compliance with its decree.

This aura of important accomplishment in regard to representation in the State Police of a proper percentage of blacks and Spanish-surnamed Americans is somewhat marred by the motion now at hand for determination. The motion states that plaintiff United States moves the court to find that the defendants State of New York, et al. violated the nondiscrimination provisions (Paragraph 1) of the October 19, 1979 final decree by discriminating against black and hispanic male recruits in the State Police Academy in 1981. The motion requested the court to set a period of discovery and upon completion of discovery to conduct an evidentiary hearing on the motion. The motion states it is based upon reports submitted by the defendants, and depositions and other discovery obtained by plaintiff United States pursuant to provisions of the decree. A memorandum in support of the motion sets forth a number of incidents obtained from the depositions and reports that are claimed by the United States to reveal that black and hispanic recruits, in the 1981 recruit training class from February 1981 to July 1981 at the State Police Academy in Albany County were subjected to discriminatory practices and were treated differently from the white recruits.

The background facts and their development that led to the filing of the motion with these very serious charges are important to relate. Admittedly, the interest of the Civil Rights Division of the United States Department of Justice was stimulated by a New York Times article published on July 18, 1981. The news article reported that the proportion of minority recruits graduating from the New York State Police Academy Class held from February to July 1981 (1981 Academy Class) was significantly less than the white recruits who graduated. One hundred nine-two (192) recruit troopers began that Academy basic training course; 88, or 93.6% of 94 white males who began the course completed it, and only 39, or 51.3% of the 76 black and hispanic males who began the course completed it. The black and hispanic male rate was 54.8% of the white male passing rate. This 1981 Academy Class of recruits was the first one to follow the entry of the 1979 Final Decree.

The follow-up on the New York Times newspaper article is set forth in the defendants pretrial memorandum, pp. 2 to 6. It is sufficient to state that the Civil Rights Division of the Department of Justice contacted the State Police in the Fall of 1981 with the request to examine all records of the 1981 Academy Class. Such examination was conducted and copies made of certain records by federal government personnel and attorneys. In January 1982, the Department of Justice requested by letter to the State Police the reinstatement of all minorities and women who left the 1981 Academy Class regardless of their reasons for leaving. The letter contained general allegations and few specifics. After preliminary examination of records, the State Police informed the Department of Justice that it could not agree with the charges of discrimination and denied the request. Thereafter, by agreement, depositions were taken of twelve individuals whom the Department of Justice identified as ones who had the most to say about the alleged discrimination. After the passage of many months, correspondence at the highest lev-

el ensued. In July 1983, William Bradford Reynolds, Assistant Attorney General, Civil Rights Division, wrote to Robert Abrams, Attorney General of the State of New York, advising that the Department of Justice had concluded that the State Police had violated the Final Decree in regard to the 1981 Academy Class. Assistant Attorney General Reynolds requested in the letter that the minorities who had not graduated from that class be offered positions as recruit troopers in the next two recruit training Academy Classes. Assistant Attorney General Alan S. Kaufman for Attorney General Abrams, by letter dated August 25, 1983, disagreed with the conclusion of discrimination and refused the relief requested. Thereafter, depositions were taken of Lt. Colonel Baker, the officer in charge as Lieutenant of the 1981 Academy Class, and several administrative staff members of the Academy. The motion now being considered was not filed in this court until February 21, 1984, with a return date of May 7, 1984. Several pretrial conferences were then held by the court with the attorneys on discovery and witness problems. An evidentiary hearing in Albany commenced on May 23, 1984 and concluded on May 30, 1984—a five-day period.

At the five-day evidentiary hearing, six (6) witnesses testified for the United States, and excerpts from the depositions of seven other recruits who did not graduate from the 1981 Academy Class were read into the record by the United States. The defense read other portions of such depositions into the record asserting clarification purposes or to show contradictions and inconsistencies to the portions read by the plaintiff. The defendants called sixteen (16) live witnesses and read other depositions. Numerous exhibits were offered and received in evidence. The testimony given at the hearing has not been transcribed. My decision herein is based upon my own notes taken at the trial and recollection of each witness as to their demeanor on the witness stand and the worth of their testimony. As requested, proposed findings of fact and conclusions of law have been submitted on the motion by both sides. There has been full compliance with my request: One hundred forty-six (146) Proposed Findings of Fact and twenty-four (24) Conclusions of Law have been submitted for the United States, and two hundred twelve (212) Proposed Findings of Fact and fourteen (14) Conclusions of Law for the defendants. These proposed findings and conclusions are on file with the Clerk as part of the case record. The proposed findings of fact are helpful in that they relate to the testimony concerning the various incidents that the United States mainly rely upon to prove its serious charge that a working environment was created in the 1981 Academy Class that was charged with racial hostility and harassment. (Pl. Proposed Conclusion of Law 19). My findings and conclusions shall be brief and made in my own fashion, with designation of certain of the proposed findings and conclusions supplementary to and adopted as my own. The names of the five unsuccessful recruits, the remaining interested individuals, for whom the United States seeks relief shall be avoided. Only two of these five unsuccessful recruits seek reinstatement to the next New York State Police Academy Class with retroactive seniority and back pay to July 16, 1981; and back pay is sought for three other unsuccessful recruits, not interested in reinstatement, from the date they were terminated from or left the 1981 Academy Class until May 23, 1984, the date of the evidentiary hearing.

It was my impression at the conclusion of the evidentiary hearing that there was a complete failure of proof on the part of the United States that would give reasonable support to its contention that there existed an atmosphere of racial discrimination in the 1981 Academy Class that prevented the successful completion and graduation of some black and hispanic recruits from the class. Frankly, at the conclusion of the evidentiary hearing, a bench decision denying the motion in its entirety was in my mind. However, the importance of the issues and the substantial publicity that adversely reflected upon the administration

by the New York State Police of this 1981 Academy Class indicated the better course was to undertake review of the full record and the issuance of a more complete written decision. After careful review and consideration, my first impression remains that not only was there a failure of proof on the part of the government, but also that there was overwhelming evidence presented by the defendants that countered completely the claimed existence of hostility and harassment against blacks and hispanics in the 1981 Academy Class that unfairly prevented the successful completion of the basic training course by some. There is no doubt that paragraph 1 of my Final Decree dated October 19, 1979, permanently enjoined the defendants by express terms from engaging in any act or practice which has the purpose or effect of unlawfully discriminating against any black or Spanish-surnamed American or females. There also should be no doubt that if there were presented at the hearing the necessary legal and factual support for conduct violative of the injunction, there would be no hesitation by this court to enforce such provisions and make any victim whole. *See Vermont Structural Slate Co. v. Tatko Bros. Slate Co.*, 253 F.2d 29 (2d Cir.1958). An injunction often requires continuing supervision by the issuing court and always a continuing willingness to apply its powers and processes on behalf of the party who obtained that equitable relief. *System Federation v. Wright*, 364 U.S. 642, 647, 81 S.Ct. 368, 371, 5 L.Ed.2d 349 (1961). Despite the failure of proof here, the court, of course, is pleased by the efforts of the Civil Rights Division, United States Department of Justice, to police the provisions of the decree and thus insure full compliance with the mandate to hire the necessary percentages of qualified minorities by the New York State Police until their number reaches the approximate percentage of their presence in the New York State labor force.

The proof of the United States had the inherent weakness of being based upon a partial investigation that in my experience seldom presents a true and complete picture of the entire situation. The plaintiff United States selected for deposition twelve (12) black and hispanic recruits, all of whom had left the 1981 Academy. The United States did not depose or seek to depose any minority or white recruits who graduated from the Academy. (Defts. Proposed Finding of Fact 5 and 6). As previously noted, the substantial number of one hundred ninety-two (192) sworn as recruit troopers commenced the 1981 Academy Class. Eighty-eight (88) white males out of ninety-four (94) completed the basic training course, and thirty-nine of the seventy-six (76) black and hispanic males completed the course. It is clear a substantial number of recruit troopers who actually experienced the daily activity and atmosphere of recruit training in the 1981 class were undeposed, and apparently were not even interviewed by personnel or attorneys of the Civil Rights Division. It is an important consideration that of the small number deposed from the large group that only five minority recruits came forward to testify at the evidentiary hearing in support of the motion. The defendants put on the witness stand six (6) minority recruits and two (2) minority counselors, all of whom denied the presence of racial discrimination or that black and hispanic recruits were treated any differently than white recruits. All witnesses described the training course as tough and the academic load heavy—described and accredited as one on a college level. (Defts. Proposed Findings of Fact 21, 23, 24, 27).

The response to the defendants' pretrial memorandum stated in these words that the working environment in the 1981 Academy was so charged with racial discrimination that it ultimately resulted in the resignation of a number of minority recruits, that the discrimination occurred in the form of special, unfair harassment of minority recruits, including racial slurs, jokes and epithets and disproportionately onerous work details and physical discipline, and ubiquitous innuendoes that minorities were inferior and did not belong in the Academy. (Plaintiff United States Response to Defts. Pretrial Memorandum p.

21). This description increased in strength with the statement that there was frequent use of racial terms and a daily barrage of racial jokes and slurs directed at minority recruits. *Id.* p. 23.

The testimony and exhibits at the evidentiary hearing offered by the government fell far short of supporting these contentions, and, in fact, from my appraisal showed that the inferences the United States seeks to draw from a series of incidents which it stressed throughout are unreasonable and unwarranted. The incidents upon which the United States rely to prove the serious charge of racial discrimination are itemized and discussed in its Post Trial Memorandum: (1) Academy References to Court Order (Final Decree of October 19, 1979), (2) Policy against Cliques (in cafeteria having minority recruits move to mingle and sit at tables with white recruits), (3) Work Detail, other Punishment and Harassment (maintenance, policing grounds, painting for two-hour periods for a set number of days imposed for infractions of rules and regulations; one recruit who testified being compelled to carry a pole or barrier with a scatological remark on it at the firing range, and another who testified being directed to carry a pet rock due to delinquencies in conduct at the firing range, and another being exposed to live and dead snakes which he feared), (4) Rooms Torn Apart (counselors in the beginning did this if room and clothing were not kept in conformity with regulations, and then by recruits feuding with each other), (5) Runners Selected by Peer Vote (recruits would vote on which of their fellow recruits would engage in run of substantial distance), (6) Racial Jokes and Comments (including mispronouncement of one minority recruit's name and making fun of it by instructors and other recruits).

My findings seriatim to these items are: (1) References to the court order of October 19, 1979, were made in good faith and for sensible purposes. I find nothing in the speeches of Lt. Colonel Baker or discussion by instructors concerning the court order or affirmative action that implied the minorities did not have the ability to complete the Academy course successfully and that the State Police did not expect or want the minorities to succeed. Disagreement and dissatisfaction with the court order in this first Academy Class to be assembled under the federal decree was to be expected. I find the open discussions a constructive method to encourage better understanding. The inferences and implications of racial discrimination existed only in the later rationalization of a few disappointed and unsuccessful minority recruits.

(2) Policy against Cliques: This came about because the blacks and hispanics were sitting at tables with each other in the Academy Cafeteria. The policy was to have them mingle with the white recruits. I find the policy sensible and constructive, and in fact a decision that shows realization that racial tensions will lessen if the recruits get to know each other through their personalities rather than their appearance. I find insignificant and unimpressive the government contention that having the blacks move to sit with the whites rather than vice versa indicates racial discrimination.

(3) Work detail, Other Punishment and Harassment: I find the disciplinary work details imposed were justified and supported by the records of the recruits who were so punished. The disciplinary punishment was not hard labor, but involved painting, policing grounds, and tasks of that kind for a two-hour period, 9:00 to 11:00 p.m. for a certain number of days. There was no work detail on Friday to Sunday night, and there was adequate time for study if the recruit was so inclined. Two of the minority recruits who testified at the hearing were never on work detail, and one white recruit from the record and testimony seemed to be on the work detail most of the time. Therefore, I find such punishment was not imposed for racial reasons, but for infractions of regulations and poor attitudes. The two minority recruits compelled to carry a pole or barrier at the firing range, and carry a pet rock for conduct there, were both qualified thereafter by the firing range instructor. The snake incidents, I consider hazing, and practical joke incidents bound to occur in this type of rugged and semi-military recruit training.

(4) Rooms Torn Apart: This incident involved the messing up of the recruits rooms in the beginning of the training course by instructors when clothes were not hung or beds not made in accord with regulations. The other room tearing up occurred when there were personality clashes among the recruits. At times several whites did it to the rooms of blacks, and blacks did it to several whites. I find these instances few and over a long period of close association and competition. When called to the attention of Lt. Colonel Baker, the officer in charge, he stopped it completely. The incidents cannot be accepted as a result of race discrimination.

(5) Runners Selected by Peer Vote: The explanation for the incident is contained in the Proposed Findings of Fact submitted by defendants, Peer Rating System, 104–108, Medium Distance Run 109–115. I adopt those proposed findings. The Peer Rating System was adopted from procedures used at the United States Military Academy, West Point, and used at the State Police Academy since 1973. The medium distance run was used in an attempt to upgrade the attitudes of conduct of certain recruits who were not making the grade. I find neither procedure was used to discriminate against minority recruits and were solely programs initiated to guarantee the selection of qualified troopers.

(6) Racial Jokes and Comments: The minority recruits who testified recalled only several, as usual with racial jokes; several should have been left untold. However, as I stated at the hearing, racial and ethnic jokes are told at every level of our society; many give humor and many are offensive. I find that the alleged jokes included ethnic jokes other than those relating to blacks and hispanics. The stated purpose was to ease tension and to break the monotony of the classroom. I find those purposes acceptable. It must be remembered that the 1981 Academy Class was not comparable to a Sunday School class or the instruction of a group of seminarians. A total of two hundred nineteen (219) instructors were at the Academy, and their every word could not be policed by the counselors and administrative staff. The minority recruits who testified about those racial jokes never complained about them to the counselors, staff or the affirmative action officer. It is noteworthy that in the Penal Law Class in which the minority recruits testified that the most jokes were told was the subject in which they received high grades. (Defts. Proposed Finding of Fact 59). Lt. Colonel Baker immediately removed a female instructor who made an offensive racial comment. When one white recruit called a fellow recruit a "Nigger", he investigated the incident and made them room together. All in all, these unpleasant episodes must be viewed, if accepted as true, as isolated ones that were not tolerated or condoned. A good explanation and defense of them as not adding up to an existing environment of racial hostility are found in defendants' Proposed Findings of Fact 56–75 that are hereby adopted.

The evidence presented for the defendants was strong, clear and convincing. Sixteen (16) witnesses testified, among them a number of recruits including minorities who had gone through the basic training course in the 1981 Academy Class. They were unanimous, and without reservations in their testimony, that they were not conscious of nor did they observe any racial discrimination or racial hostility. It was heartening to see these recruits who successfully became troopers so happy and proud of their positions. Their friendly attitude toward each other was evident in the courtroom regardless of color and race. One female trooper testified, and it was evident from her testimony and spirit that she had pride in her trooper uniform and duties. She said there was no discrimination in the 1981 Class, and that the recruits were all treated the same, i.e., as zeroes.

The most important witness for the defense was Lt. Colonel Baker, now Deputy Superintendent, because he was the Lieutenant-in-Charge of the 1981 Academy Class. He has a remarkable background in a career not only in law enforcement with the State Police, earning many commendations at every level, but in responsible teaching and affirmative action programs. The State Police is fortunate to have him in their organization. He had been also in

charge of the 1979 Academy Class, and although the number of minorities was small in that class, the percentage of those completing the course successfully was very high. It should also be noted that there is no complaint by the United States in regard to the percentage of minorities who graduated in the 1982 and 1983 Academy Classes of the State Police.

It is my conclusion from hearing his testimony that he exerted every effort to lessen the racial tensions certain to occur in the beginning of this first substantial mingling in the State Police of whites and blacks and hispanics pursuant to the Final Decree. His state of mind in regard to affirmative action is portrayed in his remarks to the recruits that they were no longer white, black or female, but all grey as the color of their uniforms, and that racial discrimination is based on ignorance and that it was important for the recruits to know each other. He tried in a number of instances to assist minority recruits with their studies, and even their personal and family problems. The records of the five (5) complaining recruits who testified are set forth in Defendants' Proposed Findings of Fact 121–195. Such are adopted as showing justification for their resignations. As Chief Justice Warren E. Burger stated recently for an unanimous United States Supreme Court: "It would ignore reality to suggest that racial and ethnic prejudices do not exist or that all manifestations of those prejudices have been eliminated." *Palmore v. Sidoti,* — U.S. —, at —, 104 S.Ct. 1879 at 1881, 80 L.Ed.2d 421 (1984). From the evidence produced at the hearing, it is my conclusion that every effort was made at the 1981 Academy Class by the Lieutenant-in-Charge and the Administrative Staff to eliminate or lessen such prejudices. No more than the mere occurrence of isolated or sporadic discriminatory acts has been proven. *See Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977). The provisions of Paragraph 1 of the Final Decree have not been violated.

The motion of the United States and the relief requested therein is denied.

It is so Ordered.