UNITED STATES of America, Plaintiff,

v.

The CITY OF BUFFALO, et al.,
Defendants (Two Cases).

Nos. CIV–73–414C, CIV–74–195C.

United States District Court,
W.D. New York.

Sept. 5, 1989.

See also 779 F.2d 881.

United States Dept. of Justice, Civ. Rights Div. (Richard S. Ugelow, Judith L. Mathis, of counsel), Washington, D.C., for plaintiff.

Cravath, Swaine & Moore (Paul C. Saunders, of counsel), New York City, for plaintiffs-intervenors Afro–American Police Assn, Inc., et al.

Magavern & Magavern (Richard A. Moore, of counsel), Buffalo, N.Y., for plaintiff-intervenor Nat. Ass'n for the Advancement of Colored People, Inc.

Leonard F. Walentynowicz, Buffalo, N.Y., for plaintiffs-intervenors Charles Flynn, et al., and Phillip Carcaci, et al.

William A. Price, Buffalo, N.Y., for plaintiffs-intervenors Elizabeth Kraebel, et al.

Samuel F. Houston, Corp. Counsel for the City of Buffalo (Michael B. Risman, of counsel), Buffalo, N.Y., for defendant City of Buffalo, et al.

CURTIN, District Judge.

In two interim orders dated August 9, 1989, the court issued its conclusions regarding the issues of whether the 50% interim hiring goals for minorities mandated

by this court for the Buffalo Police and Fire Departments should be lifted and, if so, what provisional steps regarding hiring would be appropriate until a decision is made following a hearing or trial on the issue of whether the City of Buffalo ("City") has valid selection procedures in place. The interim orders were issued in order to allow the City to proceed with hiring and training new recruits for its fall classes in both departments. This order shall supplant those orders and constitute the court's final decision and order on these issues.

## BACKGROUND

After finding that the City had engaged in an unlawful pattern and practice of employment discrimination against Blacks, Spanish-surnamed Americans and/or persons of Spanish language ("Hispanics"), and women in its Police and Fire Departments, see 457 F.Supp. 612 (W.D.N.Y.1978), modified and aff'd, 633 F.2d 643 (2d Cir. 1980), this court ordered the City to take a number of steps to remedy that discrimination and to ensure that it did not recur. Among those steps was the requirement that the City make 50% of its entry-level and/or police officer appointments and 50% of its firefighter appointments from the pool of qualified Black and Hispanic applicants. It was ordered that these hiring requirements or "goals" would remain in effect until

the minority composition of the uniformed personnel of the Police Department and Fire Department is at least equal to the percentage of minorities in the labor force of the City of Buffalo according to the most recent census, or until this Court has found, after a hearing, that all proposed selection procedures for entry level and/or police officer and firefighter positions have been validated in accordance with the Uniform Guidelines on Employee Selection Procedures, 43 F.R. 38290 et seq. (August 25, 1978), and that no further interim goals are appropriate. Nothing herein shall preclude plaintiff United States from advocating the continuance of the interim goals on the basis that the continuing effects of past discrimination have not been eliminated.

Final Decree and Order of November 23, 1979, at ¶ 7.[1]

The City now claims that the minority composition of each department sufficiently reflects the minority composition of Buffalo's civilian labor force so as to justify terminating the 50% or "one-for-one" interim hiring requirements. By affidavits dated June 7, 1989, and June 9, 1989, the City has represented that Blacks and Hispanics now comprise, respectively, 19.2% and 5.9% of the Police Department,[2] and 20.7% and 3.8% of the Fire Department.[3] Minorities thus comprise a total of 25.1% of the Police Department, and a total of 24.5% of the Fire Department.[4] 1980 census figures

---

1. A 25% interim hiring goal for women was also established for the Police Department. Final Decree and Order of November 23, 1979, at ¶ 5. No specific numerical hiring requirement for women was set for the Fire Department; rather, the City was ordered to take affirmative steps to recruit and to hire women in numbers commensurate with their interest and with their ability to qualify on the basis of performance-related criteria. Id. at ¶ 6.

   In the 1979 decree, the court also permanently enjoined the City from

   engaging in any act or practice with respect to hiring, assignment, promotion, transfer, training or compensation which has the purpose or effect of discriminating against any employee or future employee of, or any applicant or potential applicant for employment with, the Buffalo Police or Fire Department because of such individual's race, sex or national origin, nor will they engage in any

other acts or practices which deny to [Blacks, Hispanics] or women equal employment opportunities.

   Id. at ¶ 1. See also the court's orders of December 11, 1978.

2. According to the affidavit of Ralph Degenhart, Commissioner of the Buffalo Police Department, there are 1,037 sworn personnel in the Police Department, of whom 199 are Black and 61 are Hispanic.

3. According to the affidavit of Kenneth Trometer, Deputy Commissioner in Charge of Personnel for the Buffalo Fire Department, there are 902 firefighters in the Fire Department, of which 187 are Black and 34 are Hispanic.

4. The accuracy of these figures has not been challenged by any of the other parties.

465 S.Ct. 706, 102 L.Ed.2d 854 (1989), and

supplied by the parties indicate that Blacks and Hispanics comprise, respectively, 23.2% and 2.0% of Buffalo's civilian labor force, for a total of 25.2%.

The United States agrees that the 50% goals should be terminated, arguing that the City has "substantially complied" with that part of the court's remedial order. The United States also argues, however, that the City has not established that it has valid selection procedures in place, and, therefore, that the court should enforce new interim hiring requirements until the City does so in order to ensure that the City's hiring practices do not adversely impact upon Blacks, Hispanics, and women.

Termination of the 50% hiring goal for the Police Department is opposed by plaintiffs-intervenors Afro–American Police Association, *et al.* ("AAPA"), and plaintiff-intervenor National Association for the Advancement of Colored People ("NAACP"). They argue that the 1979 remedial order must be read as requiring that the 50% hiring goal will not be lifted until the percentages of Blacks and Hispanics in the department is "at least equal to" the percentages for *each* group in the municipal labor force, and that the goal thus should not be lifted until the percentage of Blacks in the department reaches 23.2%. At a hearing held on July 21, 1989, the AAPA also presented testimony from an expert in the field of census figures and demography, Eugene Ericksen, in support of its argument that the 1980 census does not accurately reflect the percentage of Blacks in Buffalo's civilian labor force. Termination of the 50% hiring goal for the Fire Department is opposed by the NAACP for the same reason it opposes lifting of the goal for the Police Department—the percentage of Blacks in the department is not "at least equal to" the percentage of Blacks in the municipal labor force.

With regard to the Police Department, plaintiffs-intervenors Charles Flynn, *et al.* ("Flynn–Intervenors"), support lifting of the 50% interim hiring goal. Indeed, they claim that two recent decisions by the United States Supreme Court, *City of Richmond v. J.A. Croson Co.,* — U.S. —,

109 S.Ct. 706, 102 L.Ed.2d 854 (1989), and *Wards Cove Packing Co. v. Atonio,* — U.S. —, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), dictate that the need for any interim hiring goals was eliminated when the percentage of minorities in the Police Department reached the percentage of minorities that were in the City's labor market at the time the court issued its original liability decision in 1978. Thus, they argue, the use of interim hiring goals since that time has gone beyond the relief that was necessary to redress the discrimination found by the court in 1978. They argue that new findings of discrimination would be necessary in order to justify the continued use of hiring restrictions. These intervenors complain that the court's remedial decree has benefitted many individuals who have never been required to establish that they were victimized by racial or gender-based discrimination, and that, in light of these recent Supreme Court decisions, it is illegal to select them over others for employment through the use of preferential hiring ratios. With regard the Fire Department, plaintiffs-intervenors Phillip Carcaci, *et al.* ("Carcaci–Intervenors"), make essentially the same arguments. Among other things, both sets of intervenors request that the court order that they be appointed to the next vacancies occurring in the respective departments to which they have applied.

## DISCUSSION AND FINDINGS

### a) *The 50% Minority Hiring Goals*

After carefully considering the arguments and evidence presented, the court has concluded the 50% interim hiring goals should be lifted. Contrary to the arguments of the AAPA and the NAACP, the court's 1979 remedial decree does not require that the 50% hiring goals remain in place until the percentages of Blacks and Hispanics in each department is at least equal to the percentages for each of those groups in the municipal labor force. The court is satisfied that the respective proportions of Blacks and Hispanics now constituting the uniformed personnel in both the Police Department and the Fire Department sufficiently approximate the respec-

tive proportions of these groups in the City's labor force so as to satisfy the purpose of that portion of the 1979 remedial decree. In addition, the court notes that, although the percentage of Blacks in each department is slightly less than the percentage of Blacks in the general labor force, the new interim hiring requirements established herein will most likely increase the percentage of Blacks in both departments before a determination is made next year regarding the validity of the City's selection procedures.[5]

The court has thus concluded that the substantial compliance achieved by the City is sufficient to warrant lifting the interim hiring requirements imposed by the court in paragraphs 3 and 4 of the 1979 remedial order. As the United States Court of Appeals for the Second Circuit has noted, "[t]he important thing is that the duration of such hiring quotas should be no longer than is necessary," 633 F.2d at 647, and the court believes that the time has come to remove the relatively demanding one-for-one hiring requirements and to focus on determining whether the City has valid selection procedures in place.

Although, as the AAPA argues, the 1980 census may have underestimated the number of minorities in the civilian labor force, the evidence and arguments presented at the hearing have not convinced the court that the potential problems in this regard presented by the 1980 census justify disregarding those figures, or that similar problems will not result after data for the 1990 census is collected. Furthermore, the 1979 remedial order stated that the yardstick used by the court would be "the most recent census," and the court has determined that, in fairness to the City, the potential problems outlined by the AAPA do not justify the potentially extended delay that could occur while the 1990 data are compiled and analyzed.

b) *New Interim Hiring Requirements*

■ Having determined that the time has come to lift the 50% interim hiring goals, the court must now determine whether provisional steps regarding hiring would be appropriate until a decision is made following a hearing or trial on the issue of whether the City has valid selection procedures in place.

The City contends that no additional hiring requirements are justified because it has implemented valid selection procedures. This claim does not merit extended discussion. It is the City's burden to prove that it has valid selection procedures in place. As the City is well aware, it must complete its own validation studies before the court can determine whether it has met that burden. Since the City has informed the court that its validation study for each department will not be completed until late fall, it clearly is entirely premature for the City to suggest that the need for additional hiring goals has been eliminated by its implementation of valid selection procedures.

The City cites *United States v. State of New York*, 711 F.Supp. 699 (N.D.N.Y.1989), in support of its claim that no additional hiring requirements are necessary. That case, however, is readily distinguishable from the case at bar. In his recent decision lifting remedial hiring goals without setting new interim hiring requirements before the defendants in that case had established that their selection procedures were job-related or valid, Judge Foley emphasized the "spirit, cooperation and good faith" of the defendants. *Id.* at 702.[6] Such an exemplary posture has not been

---

**5.** According to affidavits submitted by the City, most retirees in both departments over the next few years will be neither Black nor Hispanic and, consequently, the percentage of minorities in both departments will increase accordingly.

**6.** In crediting the attitude of the defendants in that case, Judge Foley quoted an earlier decision of his in which he emphasized

the affirmative and continuing cooperation of the progressive Governors of New York State and the supervising officials and administrative staff of the New York State Police in the recruitment of minorities as mandated by the final decree. This court is grateful for this splendid attitude of respect for and compliance with the decree.

711 F.Supp. at 700 (quoting 593 F.Supp. 1216, 1218 (N.D.N.Y.1984)).

taken by the City in the present case. For example, the City has not demonstrated any penchant for expeditiously implementing valid selection procedures, and has needlessly delayed attempts to determine whether, in fact, it has valid selection procedures in place.[7] It is thus clear that additional interim hiring requirements are necessary to ensure that the City does not revert to the use of selection procedures that illegally exclude minorities and women from its Police and Fire Departments.

■ The arguments advanced by the Flynn–Intervenors and the Carcaci–Intervenors likewise do not merit prolonged attention. Unlike the present case, *City of Richmond v. J.A. Croson Co.* did not involve a judicially imposed remedial decree issued following a finding, after trial, of illegal employment discrimination. Furthermore, neither that case nor *Wards Cove Packing Co. v. Atonio* altered the broad power of federal district courts to implement relief that operates both retrospectively to redress past discrimination and prospectively to ensure that it does not recur. *See, e.g., United States v. Paradise*, 480 U.S. 149, 183, 107 S.Ct. 1053, 1073, 94 L.Ed.2d 203 (1987) ("A district court has 'not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.'" (quoting *Louisiana v. United States*, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965))). *See*

*also Teamsters v. United States*, 431 U.S. 324, 364–65, 97 S.Ct. 1843, 1869, 52 L.Ed.2d 396 (1977); *United States v. N.A.A.C.P.*, 779 F.2d 881, 884 (2d Cir.1985), *cert. denied*, 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986). No new finding of discrimination is necessary to justify the continued use of mandatory hiring ratios because the City has not established that it has eliminated the vestiges of its past discriminatory practices and implemented valid selection procedures in accordance with this court's remedial decree. As the Second Circuit noted in reaffirming the propriety of the relief granted by this court, "[s]uch broad discriminatory conduct" as that found here "demands equally broad prospective equitable relief. Otherwise the wrong will not be remedied." *United States v. N.A.A.C.P.*, 779 F.2d at 884.[8]

These intervenors assert that appointments to the Police and Fire Departments should be made on the basis of individual "merit, interest and effort." But that is precisely the point of this litigation. The City was found guilty of excluding individuals on the basis of factors that are the antithesis of "merit, interest and effort," namely, race and gender. The City has yet to show that interim hiring requirements are unnecessary to ensure that it will not revert to that practice.

■ The court is ever-mindful of the limits of its jurisdiction and of the need to end its involvement in the administration of the Buffalo Police and Fire Departments when

---

7. Three examples will suffice. First, the court was forced to postpone a hearing on the validity of the 1986 and 1988 written firefighter examinations scheduled for Monday, July 25, 1988, because the City had served on the Justice Department only a day earlier copious information that it claimed was crucial for the hearing. Second, the Justice Department has reported that as of June 7, 1989, it had not received any information regarding the 1989 examination administered by the Police Department. Third, the City has informed the court that its validation studies regarding the selection procedures presently in place in each department will not be completed until the end of October, 1989 —some ten months after the most recent examinations were administered.

8. To the extent that the Flynn–Intervenors and the Carcaci–Intervenors suggest that the court

should have lifted the 50% hiring goals when the percentage of minorities in the Police and Fire Departments reached the percentage of minorities that were in the City's labor market at the time the court issued its original liability decision in 1978, that position is completely inconsistent with the terms of the court's 1979 remedial decree. The decree mandated that these hiring requirements would remain in effect until "the minority composition of the uniformed personnel of the Police Department and Fire Department is at least equal to the percentage of minorities in the labor force of the City of Buffalo *according to the most recent census*" (emphasis added), and in an order dated May 13, 1986 (Item 300), the court confirmed that the 1970 census figures were no longer applicable. *See id.* at 10–11.

appropriate. But that time will not come until the City establishes in accordance with this court's orders that it hires police officers and firefighters in a nondiscriminatory manner. The court is not insensitive to the plight of those such as the Flynn–Intervenors and the Carcaci–Intervenors who may miss the opportunity to work in these departments due to the implementation of remedial hiring requirements. But "[t]he choice of any particular interim hiring ratio is necessarily somewhat arbitrary," 633 F.2d at 647, and such hardship is inevitable when a court is forced to utilize preferential hiring in order to remedy the effects of racial and gender-based discrimination of the magnitude and flagrancy found in the present case.

The United States, the AAPA, the NAACP, and plaintiffs-intervenors Elizabeth Kraebel, *et al.*, have advocated that, should the court lift the 50% hiring requirements, appointments before the court determines the validity of the City's current selection procedures should be made in proportion to the percentages of Blacks, Hispanics, and women who took the written examinations for each department from which the respective eligibility lists were developed. In other words, they advocate the use of percentages based on "applicant flow." They argue that hiring according to applicant flow is necessary to ensure that the City does not hire in a manner that causes or results in an adverse impact upon minorities and women. The City has suggested an interim requirement of 20% for minorities and that no interim ratio be implemented for women. After carefully considering the arguments of all parties, the court has determined that the wisest and fairest course is to implement interim hiring requirements based on applicant flow. *See Berkman v. City of New York*, 705 F.2d 584, 595 (2d Cir.1983); *Guardians Association of the New York City Police Department v. Civil Service Commission*, 630 F.2d 79, 108–09 (2d Cir.1980), *cert. denied*, 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981).

The court notes that counsel for the Flynn–Intervenors and the Carcaci–Intervenors rightfully complains about how long it has taken the City to implement valid selection procedures. It is, therefore, essential that the City complete its validation reports according to the timetable previously set by the court.

The history of this case teaches that due to the complexity of the issues involved in determining the validity of the City's selection procedures, the parties will need time to analyze the material contained in the validation reports produced by the City and to conduct additional discovery in order to prepare for trial. Consequently, the court concurs with the parties that a trial date should be set for February, 1990. A specific date will be set later.

To summarize the conclusions of the court and the actions to be taken with regard to the Police Department:

1) The City has substantially complied with the court's direction that the interim hiring goal for Blacks and Hispanics would remain in effect until the minority composition of the uniformed personnel of the Police Department is at least equal to the percentage of those minorities in the labor force of the City of Buffalo according to the most recent census. Therefore, that interim hiring goal is hereby lifted.

2) Until a decision is made following a hearing or trial on the issue of whether the City has selection procedures in place that meet relevant legal standards, each class entering the police academy shall include a percentage of Blacks, Hispanics, and women equal to the respective percentages of those groups among the applicants who took the written examination from which the list of eligible candidates was developed. Applicants who do not survive their probationary period shall not be counted toward fulfillment of this requirement. Minority women may be counted toward both the female and the minority applicant flow.

3) The City shall include in the semi-annual reports provided to the United States (pursuant to ¶ 21 of the court's 1979 final decree and order) the number of persons, by race and sex, to whom each written and each physical police officer examination

was administered during the reporting period.

4) To the extent not inconsistent with this order, the remainder of the court's 1979 final decree and order shall remain in full force and effect.

To summarize the conclusions of the court and the actions to be taken with regard to the Fire Department:

1) The City has substantially complied with the court's direction that the interim hiring goal for Blacks and Hispanics would remain in effect until the minority composition of the uniformed personnel of the Fire Department is at least equal to the percentage of those minorities in the labor force of the City of Buffalo according to the most recent census. Therefore, that interim hiring goal is hereby lifted.

2) Until a decision is made following a hearing or trial on the issue of whether the City has selection procedures in place that meet relevant legal standards, each class entering the firefighter academy shall include a percentage of Blacks, Hispanics, and women equal to the respective percentages of those groups among the applicants who took the written examination from which the list of eligible candidates was developed. Applicants who do not survive their probationary period shall not be counted toward fulfillment of this requirement. Minority women may be counted toward both the female and the minority applicant flow.

3) The City has requested permission to certify the 1989 eligibility list and to terminate the 1986 eligibility list. That application is granted. The City shall certify the 1989 eligibility list and shall terminate the 1986 eligibility list.

4) The women appearing on the 1989 eligibility list who are likely to be hired during the life of the list shall be identified immediately. The number of women "likely to be hired" will be based on the percentage of female applicants who took the written firefighter examination administered in 1988 and on the City's hiring projections during the life of the list. At least half of the women identified shall be hired for entry into the next firefighter academy class. The remainder shall be hired for entry into the second firefighter academy class employed after the date of the court's previously issued interim order, August 9, 1989.

5) The City shall offer to the women entering the firefighter academy a pre-academy physical training class and shall take steps to identify and, if necessary, to modify physical aspects of the academy's training program that might prevent women from successfully completing the academy and from performing the job of firefighter. The United States Department of Justice will make its expert exercise physiologist available to assist in developing the pre-academy physical training class and in identifying and, if necessary, modifying any physical aspects of the academy's training program. Representatives of the City and the Justice Department shall confer forthwith to arrange for consultations between their respective experts on these matters.

6) Should the City develop any new eligibility list subsequent to the list to be certified in or about August, 1989, but prior to issuance of the court's decision regarding the validity of its firefighter selection procedures, women shall be hired from the list for each firefighter academy class in proportion to the percentage of female applicants who took the written test upon which the eligibility list is based.

7) The City shall include in the semi-annual reports provided to the United States (pursuant to ¶ 21 of the court's 1979 final decree and order) the number of persons, by race and sex, to whom each written and each physical firefighter examination was administered during the reporting period.

8) To the extent not inconsistent with this order, the remainder of the court's 1979 final decree and order shall remain in full force and effect.

So ordered.