**UNITED STATES of America, Plaintiff,**

v.

**The CITY OF BUFFALO, et al., Defendants.**

**No. CIV–73–414C.**

United States District Court, W.D. New York.

Aug. 15, 1991.

---

**10.** The Bureau's attorney-employees, if sued, might tenably assert that they did not "act" under color of state law.

Cravath, Swaine & Moore (Paul C. Saunders, of counsel), New York City, Lawyers' Committee for Civil Rights Under Law (Richard T. Seymour, of counsel), Washington, D.C., for intervenor-plaintiffs Afro–American Police Ass'n, et al.

R. Peter Morrow, III, Acting Corp. Counsel (Michael B. Risman, Sr. Deputy Corp. Counsel, of counsel), Buffalo, N.Y., for defendant City of Buffalo.

CURTIN, District Judge.

Pending is the application of the attorneys for intervenor-plaintiffs Afro–American Police Association, et al. ("intervenors"), for attorneys' fees and related expenses from defendant City of Buffalo ("City"). In support of the application, the intervenors have submitted affidavits with exhibits of Paul C. Saunders, Esq. (Items 355, 359), and of Richard T. Seymour, Esq. (Item 354). In opposition to the application, the City has filed two affidavits of Michael Risman, Esq., Senior Deputy Corporation Counsel (Items 358, 360).

There are several aspects to the application. The first concerns efforts related to the United States Supreme Court's decision in *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984). The intervenors seek compensation for work done in successfully opposing the motions brought in 1985 by the City and the United States Department of Justice to eliminate the hiring goals ordered by this court in light of *Stotts*. The intervenors also seek compensation for the additional work done in opposing the appeal subsequently taken to the United States Court of Appeals for the Second Circuit, and for their efforts in pursuing a petition for certiorari after the Second Circuit's affirmance.

The second aspect relates to work done by the intervenors in resisting the motions by the City and the Department of Justice to lift the 50% interim hiring goals. In regard to those motions, the intervenors were not entirely successful because the court, in an interim order dated August 9, 1989, and in the final order dated September 5, 1989, *see United States v. City of Buffalo*, 721 F.Supp. 463 (W.D.N.Y.1989), found that the City had substantially complied with the conditions for lifting the 50% hiring goals that had been implemented as part of the court's 1979 remedial decree.

The court did, however, direct that interim hiring goals were still necessary and that they should be based on applicant flow, a position urged by the intervenors in the alternative.

The third aspect relates to efforts of the intervenors in preparing for trial on the issue of the validity of the City's selection procedures. Much discovery was necessary, and on the eve of trial the City agreed to develop a new test rather than to attempt to establish at trial the validity of the existing test. The intervenors argue that, since this was the relief they had hoped to obtain at trial, their efforts in bringing about this result merit a fee award.

Mr. Saunders has detailed his efforts and those of his litigation team in his initial affidavit. A detailed statement of the hours spent and the work done by him and by his associates is set forth in this filing. He seeks a total fee—based on three suggested alternative hourly rates of $225, $250, or $275—ranging from $128,162 to $159,282.10, as well as disbursements totaling $22,438.35. The application reveals that Mr. Saunders is well qualified and experienced. In addition, the records submitted in support of the application are contemporaneous and detailed.

Mr. Seymour's affidavit indicates that he has specialized in litigating many large-scale employment-discrimination cases. In this case, his main responsibility was to provide special advice to Mr. Saunders and his associates in handling complicated legal issues that arose during the course of the litigation. He seeks compensation at an hourly rate of $225, and has provided a detailed account of his qualifications and experience and of the time he has spent working on this case. He seeks a total of $15,975 in fees and reimbursement of $2,642.49 for out-of-pocket expenses.

The City opposes the fee application, arguing alternatively that the intervenors did not prevail or, if it is found that they did prevail, that there was only moderate relief granted. The City argues that the actions that eventually led to the fee application were initiated and pressed mainly by the Department of Justice, and that, consequently, the City should not be responsible for the intervenors' attorneys' fees. The City also asserts that an examination of the application shows that there is duplication of effort among the intervenors' lawyers, and that the hourly rate sought for each is excessive.

■ The threshold issue for each aspect of the application is whether the intervenors can be considered "prevailing parties." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). A plaintiff will be considered a prevailing party if he or she "has succeeded on 'any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit.'" *Texas State Teachers Ass'n v. Garland Independent School Dist.*, 489 U.S. 782, 791–92, 109 S.Ct. 1486, 1493, 103 L.Ed.2d 866 (1989) (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 278–79 (1st Cir.1978)). A plaintiff must receive "at least some relief on the merits of his claim before he can be said to prevail." *Hewitt v. Helms*, 482 U.S. 755, 760, 107 S.Ct. 2672, 2675, 96 L.Ed.2d 654 (1987). *See also Dague v. City of Burlington*, 935 F.2d 1343, 1357 (2d Cir.1991); *Koster v. Perales*, 903 F.2d 131, 134–35 (2d Cir.1990).

If I find the intervenors to have prevailed on a given aspect of their application, I shall then use the instruction set forth by the Supreme Court in *Hensley v. Eckerhart* with regard to any fees awarded. The court stated in that case:

The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate....

The district court also should exclude from this initial fee calculation hours that were not "reasonably expended." ... Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary.... Hours that are not prop-

erly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority....

....

The product of reasonable hours times a reasonable rate does not end the inquiry. There remain other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of the "results obtained." This factor is particularly crucial where a plaintiff is deemed "prevailing" even though he succeeded on only some of his claims for relief....

In some cases a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories. In such a suit, even where the claims are brought against the same defendants—often an institution and its officers ...—counsel's work on one claim will be unrelated to his work on another claim. Accordingly, work on an unsuccessful claim cannot be deemed to have been "expended in pursuit of the ultimate result achieved." ... The congressional intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim.

461 U.S. at 433–35, 103 S.Ct. at 1939–40 (citations and footnotes omitted) (emphasis supplied).

Keeping these criteria in mind, I will first discuss the merits of each claim and, if I conclude that the intervenors have prevailed on any claim, then determine a percentage figure indicating the extent to which they have prevailed. The claims may be conveniently divided into three general categories: a) the *Stotts* claim, which will be further divided into separate consideration of that claim before the Second Circuit and in the petition for certiorari that followed; b) the motion to terminate the 50% hiring goals, which also shall be further divided; and c) the order granted on the eve of trial.

## A. *The Stotts Claim*

Mr. Saunders's firm, Cravath, Swaine, & Moore, and the Lawyers' Committee for Civil Rights Under Law, with which Mr. Seymour is associated, were asked to appear for the intervenors when the Department of Justice, the City, and other intervenors attempted to vacate or to modify this court's order of November 23, 1979, which had set 50% minority hiring goals for the Buffalo Police Department. After intervention was granted, counsel for the intervenors filed papers opposing these efforts. The motions filed by the City and the other parties were based upon the Supreme Court's decision in *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984). This court held that *Stotts* did not apply, noting that the Second Circuit's decision in *EEOC v. Local 638 ... Local 28 of Sheet Metal Workers' Int'l Ass'n*, 753 F.2d 1172 (2d Cir.1985), *aff'd*, 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986), clearly appeared to be controlling. *See United States v. City of Buffalo*, 609 F.Supp. 1252, 1253 (W.D.N.Y.1985). The ensuing appeal to the Second Circuit resulted in the affirmance of this court's order. *See* 779 F.2d 881 (2d Cir.1985), *cert. denied*, 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986). The appeal was taken by the United States but, although it did not file a notice of appeal, the City filed a brief in support of the Department of Justice's position.

It is apparent that the intervenors have prevailed on this issue. The City argues, however, that fees should be charged to the United States and not to the City. But the attorney for the City appeared before and urged this court to modify the 1979 order. And although the City did not file a notice of appeal, its attorney was present at oral argument before the Second Circuit and lent support to the Justice Department's formal appeal.

As to this part of the application, the intervenors prevailed over the opposition of both the City and the United States. The question thus arises whether the City's liability for fees and expenses should be con-

sidered joint and several. In *Koster v. Perales*, the Second Circuit provided the following guidance:

> Although the law governing apportionment of attorney's fees assessments remains relatively unsettled ... district courts have appropriately considered a variety of factors in allocating fee liability including the relative culpability of the parties ... and the proportion of time spent litigating against each defendant....
>
> On the basis of these considerations, the district court may allocate the fee award between the responsible parties, setting the percentage for which each is liable where the claims against the defendants are separate and distinct or where culpability is significantly unequal ... or it may hold the responsible parties jointly and severally liable for the fee award.

903 F.2d at 139 (citations omitted). The court further noted that "although apportionment may in some cases be a more equitable resolution, there is no rule in this circuit that requires it whenever possible." *Id.* Although these guidelines on apportionment were set forth in the context of determining the relative liability for fees between two or more defendants who had been found substantively accountable on an underlying cause of action, I find the guidelines useful in the context presented here: of the two parties responsible for the fees incurred by the intervenors, one—the United States—is a plaintiff.

Under the circumstances presented here, it would be most difficult and impractical to pinpoint the relative responsibility of the City and of the United States for the collective position taken. In any event, I find that the City was no less responsible than the United States for the intervenors' efforts in regard to the *Stotts* claim before both this court and the Second Circuit. Therefore, I hold that the City should be held fully answerable, and thus impose joint and several liability for these fees and expenses.

■ After the intervenors' success before the Second Circuit, both they and the United States petitioned for a writ of certiorari. Mr. Saunders explains that this was done for the purpose of attempting to consolidate this case with two other cases in which the Supreme Court had already granted certiorari to review the same issue and which, in Mr. Saunders's view, had less favorable factual settings. The Supreme Court denied the petitions on July 7, 1986. In the present case, the original application for certiorari was made by the Justice Department and not by the City. Consequently, no award shall be made against the City for these efforts.

### B. *The 1989 Motion to Terminate Hiring Goals*

■ In June, 1989, the Department of Justice and the City again moved to vacate the 50% hiring goals. The City argued that the minority composition of both the police and fire departments sufficiently reflected the minority composition of Buffalo's civilian labor force so as to justify terminating the one-for-one interim hiring requirements. The United States agreed that the 50% goals should be terminated, arguing that the City had substantially complied with that part of the court's 1979 remedial decree. The City also argued that it had valid job-selection procedures in place, thereby obviating the need for additional interim hiring requirements; in the alternative, the City argued that the court, if it were to reject that argument, should impose an interim requirement of 20% for Blacks and Hispanics but no interim ratio for women.

The intervenors opposed the attempt to lift the one-for-one interim hiring requirements as they applied to the police department. Alternatively, they argued that, should the court decide to lift the 50% hiring requirements, appointments should be made based on "applicant flow"—that is, in proportion to the percentages of Blacks, Hispanics, and women who took the written examination from which the eligibility list was developed—until the City was able to demonstrate that its selection procedures were predicated on a valid test.

A hearing was held on this application on July 21, 1989. In an order dated September 5, 1989, the court determined:

> The City has substantially complied with the court's direction that the interim hiring goal for Blacks and Hispanics would remain in effect until the minority composition of the uniformed personnel of the Police Department is at least equal to the percentage of those minorities in the labor force of the City of Buffalo according to the most recent census.

*United States v. City of Buffalo*, 721 F.Supp. at 468. The court, however, rejected the City's other arguments and ordered that future interim hiring goals were required and would be based on applicant flow as urged by the intervenors and the United States. *Id.*[1] The effect of this provision was to reduce the interim hiring requirements per class from 50% minority to about 34% minority.

The City urges that it is clear from the court's order that the relief it sought along with the United States was granted and that the intervenors did not prevail in their efforts to prevent the lifting of the interim hiring goals. That, however, is hardly a fair characterization of what transpired. In fact, the City sought much more than simply the lifting of the one-for-one hiring requirement; it also contended that no additional hiring requirements were justified because it had implemented valid selection procedures. That position was successfully opposed by the intervenors, and the court further adopted the applicant-flow hiring procedure supported by the intervenors. Although the City urges that the principal proponent of applicant-flow hiring was the Justice Department, I find that Mr. Saunders's early, vigorous, and persuasive arguments for applicant-flow hiring were an integral part of a joint successful effort. The intervenors thus have prevailed in part on this issue and should be given appropriate credit for their success.

As to this part of the application, I find that it may conveniently be separated into two parts: one is the motion to terminate the 50% hiring goals and the other is the attempt by the Department of Justice and the intervenors to obtain a court order providing for applicant-flow hiring. The intervenors were not successful in their efforts opposing the motion to terminate the 50% hiring goals, but they were successful in their efforts to force the City to utilize applicant-flow hiring. Therefore, the intervenors shall be compensated for 50% of the hours devoted to this portion of the litigation.

### C. Order Before Trial in 1990

■ Following the entry of the court's September 5, 1989, order, the parties began preparing for trial on the issue of whether the City, in fact, had developed valid selection procedures. Both the United States and the intervenors believed that the test proposed by the City would adversely impact upon Blacks, was invalid, and, therefore, could not be used. The City was urged to continue its efforts to develop a test that would not result in adverse impact. The City refused to develop a new test at that time, and trial was set for February 26, 1990. In order for the parties to prepare for trial, they had to pursue extensive discovery of documents and to conduct a number of depositions.

Shortly before the trial was to begin, the City sought an adjournment. In the application, the City indicated that it and the other parties were drafting a consent order under which it would agree not to use the then-existing police-officer entrance examination for hiring based on rank order; instead, the City would continue hiring based on applicant flow until it developed a new test that was found by the court to meet relevant legal standards. The details of this proposal required intensive negotiations in which the intervenors played a major role. Finally, a consent order was approved on March 8, 1990.

---

1. Intervenor-plaintiff National Association for the Advancement of Colored People and intervenor-plaintiffs Elizabeth Kraebel, et al., also argued in favor of basing future interim hiring on applicant flow. Intervenor-plaintiffs Charles Flynn, et al., argued for the elimination of all hiring goals.

The City maintains that the principal work in this effort was made by its attorneys and those of the Department of Justice, but I find that counsel for the intervenors contributed effectively and importantly in these proceedings, which ultimately resulted in a consent order establishing the steps the City would take to develop valid selection procedures.

The intervenors clearly prevailed on this issue. What the intervenors sought by trial was an order of the court directing the City to develop a new and valid test. That is exactly the relief that was obtained after trial preparation and negotiation. *See Koster v. Perales*, 903 F.2d at 134. As noted by the Supreme Court:

A lawsuit sometimes produces voluntary action by the defendant that affords the plaintiff all or some of the relief he sought through a judgment—*e.g.*, a monetary settlement or a change in conduct that redresses the plaintiff's grievances.

When that occurs, the plaintiff is deemed to have prevailed despite the absence of a formal judgment in his favor.

*Hewitt v. Helms*, 482 U.S. at 760–61, 107 S.Ct. at 2676. The intervenors thus should be given full credit for their efforts in this regard.

### COMPUTATION OF TIME DEVOTED TO EACH CLAIM

Mr. Saunders states the following in his affidavit:

With respect to the hourly rate to be applied to the hours that we have devoted to this matter, set forth below, for illustrative purposes only, is a matrix showing different fee awards if three different hourly rates are used. Each of the three possible hourly rates is lower than my firm customarily charges for such work based upon our progress rates:

|  | Hours | Hourly Rates | |
|---|---|---|---|
| Mr. Saunders | 330.50 | $225 | $250 |
| Mr. Cox | 68.50 | 100 | 125 |
| Ms. Breese | 204.75 | 70 | 95 |
| Mr. Neis | 76.50 | 50 | 60 |
| Paralegals | 110.75 | 25 | 30 |
| Secretaries | 239.00 | 15 | 20 |
| Out-of-Pocket | | | |
| Disbursements | $ 22,438.35 | $ 22,438.35 | $ 22,438.35 |
|  | 128,162.20 | 145,769.60 | 159,282.10 |
| Total: | $150,600.55 | $168,207.95 | $181,720.45 |

However, we will leave it to the Court to set an appropriate hourly rate. In order to avoid any dispute concerning the computation of a fee award in this case, we hereby offer to accept—and not to challenge—any hourly rate that the Court deems appropriate.

Item 355 at ¶ 17.[2] He then attaches schedules for each attorney, paralegal, and secretary showing the hours worked and the reason why certain rates were charged.

While not agreeing with this analysis, Mr. Risman has broken down the time worked by each attorney on the various aspects of the case as follows:

---

**2.** Douglas Cox and Betsy Breese were associates of Mr. Saunders at Cravath, Swaine & Moore. Robert Neis was a summer associate at the firm.

An analysis of the attorneys [sic] time for each portion reveals the following:

A. Stotts Motion and Appeal

| Attorney | Hours (approximate) |
| --- | --- |
| Saunders | 152.00 |
| Cox | 68.50 |
| Breese | 204.75 |
| Paralegals | 110.75 |
| Seymour | 8.567 |

. . . .

B. Motion to Terminate Hiring Goals

| Attorney | Hours (approximate) |
| --- | --- |
| Saunders | 84.00 |
| Neis | 76.50 |
| Seymour | 1.00 |

. . . .

C. Joint Order

| Attorney | Hours |
| --- | --- |
| Saunders | 94.00 |
| Seymour | 71.367 |

Item 358 at ¶ 48.

Mr. Risman's breakdown of time spent by the intervenors' counsel seems to be within bounds, and I will accept his analysis of the hours spent by the attorneys on each claim.

On the *Stotts* claim, I find that 50% of the time devoted by the attorneys should be allocated to the efforts in this court and 25% to the appeal before the Second Circuit; 25% shall be assigned to the petition for certiorari. As I have previously indicated, an award shall be made for the fees incurred as part of the intervenors' efforts with respect to the *Stotts* claim before both this court and the Second Circuit, but not for those associated with the petition for certiorari. Therefore, the following breakdown of hours to be compensated will result:

A. Stotts Motion and Appeal

| Attorney | Hours |
| --- | --- |
| Saunders | 114.00 |
| Cox | 51.375 |
| Breese | 153.5625 |
| Paralegals | 83.0625 |
| Seymour | 6.42525 |

As also indicated above, an award should be made for the intervenors' efforts to secure hiring based on applicant flow, but not for the intervenors' opposition to the motion to terminate the 50% hiring goals. Therefore, I will apply a 50% ratio to the breakdown of hours submitted by Mr. Ris-

man in this category. The following time is thus credited:

Motion to Terminate Hiring Goals

| Attorney | Hours |
| --- | --- |
| Saunders | 42.0 |
| Neis | 38.25 |
| Seymour | 0.5 |

As to the intervenors' efforts with regard to the order before trial in 1990, the following hours shall be credited:

Order Before Trial in 1990

| Attorney | Hours |
| --- | --- |
| Saunders | 94.00 |
| Seymour | 71.367 |

■ I shall now consider other objections made by Mr. Risman to the fee application. He contends that the hourly rate sought for each of the intervenors' attorneys and their staff is unreasonable. His argument that the appropriate rate is the one that would be charged by a local attorney in this community for substantially similar work is well taken. *See Blum v. Stenson,* 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984); *McCann v. Coughlin,* 698 F.2d 112, 130 (2d Cir.1983). Furthermore, I find that there is no reason to believe that services of equal quality were unavailable in this community with respect to the issues involved in this case. I find that the appropriate rate that would be charged in this community for work of similar competence would be as follows: for Mr. Saunders, $175 per hour; for Mr. Seymour, $150 per hour; for Mr. Cox, $90 per hour; for Ms. Breese, $70 per hour; for Mr. Neis, $50 per hour; and for the paralegals, $25 per hour.

I agree that, as Mr. Risman suggests, there normally should be a reduction for the hourly rate awarded for travel time. However, in light of the many hours and out-of-pocket expenses that the intervenors' counsel and staff have excluded from their application in the exercise of billing judgment,[3] I shall not reduce the award for those hours devoted to travel.

■ I find no support for the separate application for secretaries' time, and, although a small matter, an award should not be made for time spent in conversation with newspaper reporters.

---

**3.** For example, Mr. Saunders has indicated that he and his litigation team have excluded literal-

ly "hundreds" of hours from the application. *See* Item 359 at ¶ 13.

I have considered carefully the City's argument that the time spent by the intervenors' attorneys was excessive and duplicative. I refuse, however, to reduce the award further. The efforts of Mr. Saunders and his associates and those of Mr. Seymour were essential to ensure that the orders of this court were kept in force in the face of efforts by the City and, at times, by the Department of Justice to dilute substantially the impact of the 1979 remedial decree. In addition, a number of meetings were held in court and in chambers, and at these conferences Mr. Saunders always had constructive suggestions. The court is also aware that much important work in this case was completed by Mr. Saunders outside the courtroom. In short, Mr. Saunders's forceful and skillful advocacy provided a moderating influence to discussions and helped bring problems to prudent and well-considered resolutions, while at all times thoroughly protecting the rights of his clients. Furthermore, it is apparent from the history of this litigation that at times the City has been a difficult and obstinate defendant,[4] and there can be no doubt that this factor contributed needlessly to the time and effort required by the intervenors' counsel and staff.

It is well established that fee awards need not be reduced for time expended on unsuccessful motions or contentions. *See,* *e.g., Hensley v. Eckerhart,* 461 U.S. at 434–35, 103 S.Ct. at 1939–40; *Green v. Bowen,* 877 F.2d 204 (2d Cir.1989); *McCann v. Coughlin,* 698 F.2d at 129–30; *Planned Parenthood of Cent. and N. Arizona v. State of Arizona,* 789 F.2d 1348, 1352–53 (9th Cir.), *aff'd,* 479 U.S. 925, 107 S.Ct. 391, 93 L.Ed.2d 346 (1986). Indeed, the Supreme Court has noted that, even after a court chooses what it considers a reasonable hourly rate and trims excess hours, it can adjust an award upward in light of the quality and success of an attorney's efforts. *See Hensley v. Eckerhart,* 461 U.S. at 434–35, 103 S.Ct. at 1939–40. In light of these standards, the court believes the City is in no position to complain about the award made today, particularly in light of the fact that it has been reduced in regard to both the petition for certiorari and the 1989 motion to terminate the 50% hiring goals. In sum, in light of the pivotal role played by counsel for the intervenors in this litigation, as well as their efforts to keep costs down by excluding much time and out-of-pocket expenses from their application, I shall not reduce the award any further.

The following is a tabulation of the time and rates upon which I will base the award of fees and expenses to the intervenors' counsel. I have rounded off each portion of the award to arrive at a final figure.

## TABULATION OF HOURS ALLOWED AND HOURLY RATE APPROVED

### Stotts Application

| Attorney | Hours | Rate | Award |
|---|---|---|---|
| Saunders | 114.00 | $175 | $19,950.00 |
| Cox | 51.375 | $ 90 | $ 4,623.75 |
| Breese | 153.5625 | $ 70 | $10,749.38 |
| Paralegals | 83.0625 | $ 25 | $ 2,076.56 |
| Seymour | 6.42525 | $150 | $ 963.79 |

### Applicant–Flow Hiring

| Attorney | Hours | Rate | Award |
|---|---|---|---|
| Saunders | 42.00 | $175 | $ 7,350.00 |
| Neis | 38.25 | $ 50 | $ 1,912.50 |
| Seymour | .50 | $150 | $ 75.00 |

4. *See, e.g., U.S. v. City of Buffalo,* 721 F.Supp. at 467 ("[T]he City has not demonstrated any penchant for expeditiously implementing valid selection procedures, and has needlessly delayed attempts to determine whether, in fact, it has valid selection procedures in place.").

Order Before Trial in 1990

| Attorney | Hours | Rate | Award |
|----------|-------|------|-------|
| Saunders | 94.00 | $175 | $16,450.00 |
| Seymour | 71.367 | $150 | $10,705.05 |

---

D. *Application for Disbursements*

The application for disbursements for work done in preparing the petition for certiorari must be disallowed. Those disbursements appear to be as follows:

| | |
|---|---|
| Pandick Press (for printing) | $6,382.00 |
| U.S. Supreme Court filing fee | 200.00 |

■ Furthermore, because of the Supreme Court's decision in *West Virginia University Hospitals, Inc. v. Casey,* — U.S. ——, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991), the application for costs in the amount of $2,321.36 for the appearance of Dr. Eugene Ericksen may only be permitted to the extent of $30.

It would be most difficult and impractical to determine what part of the disbursements should be charged to each application; therefore, the disbursements of Mr. Saunders's office shall be allowed to the following extent:

| | |
|---|---|
| Postage/Misc. | $ 484.89 |
| Document Reproduction | 3,143.83 |
| Telephone/Fax | 461.58 |
| Outside Data Base (Westlaw) (Dialog) | 295.70 |
| Special Courier (Federal Express) | 180.25 |
| Research Information Services | 380.25 |
| Mead Data–Lexis | 3,073.65 |
| In–House Data Processing | 704.85 |
| Messengers | 56.00 |
| Telecopy | 202.00 |
| Pandick Press (cover for Second Circuit Brief) | 292.00 |
| National Economic Research Assoc. Associates (Document Reproduction from Sonship Press) | 180.97 |
| Eugene R. Beckstein (Official Court Reporter) | 700.50 |
| Jack Hunt (Court Reporter) | 760.52 |
| Dr. Eugene Ericksen | 30.00 |
| Total | $10,946.99 |

The travel expenses listed in Mr. Saunders's initial affidavit (Item 355, Exhibit G at items 1 through 9) are allowed, yielding a total award for travel expenses of $2,618.

Mr. Seymour also seeks compensation for disbursements, including travel expenses (Item 354 at 24). All are allowed except for item A.(3) in the amount of $337.36, which represents travel expenses associated with the *Stotts* appeal before the Second Circuit. Therefore, his award for disbursements shall be reduced from $2,642.49 to $2,305.13.

I believe that a few additional comments regarding the contributions to this case of Mr. Saunders and his litigation team are in order. Although I felt constrained not to award the full amount requested, that should not be read as a reflection of the quality of the representation provided to the intervenors. As lead counsel for the intervenors, Mr. Saunders has done no less than a superb job. While it is important in any case that a party receive diligent representation, it is particularly important in civil-rights cases in light of the acute public interest that always exists in such litigation independent of the interests of the litigants themselves. In the present case, Mr. Saunders has served the interests of both his clients and the public outstandingly. Time and again he has demonstrated a keen understanding of relevant legal authority as well as a thorough familiarity with the full record, the latter being a particularly impressive achievement in

light of the complicated history of this case and the fact that he became involved in the lawsuit nearly twelve years after it originally was filed. His firm grasp of both the law and the facts has been of great assistance to the court, and his efforts have been essential to the progress made in the case in the recent past.

In sum, the City shall pay the firm of Cravath, Swaine, & Moore $63,112.19 for attorneys' fees and $13,564.99 for expenses, for a total award of $76,677.18. The City shall pay the Lawyers' Committee for Civil Rights Under Law $11,743.84 for attorneys' fees and $2,305.13 for expenses, for a total award of $14,048.97.

So ordered.