Reginald WALKER, et al., Plaintiffs,

v.

Thomas A. COUGHLIN,
et al., Defendants.

No. 75–CV–538L.

United States District Court,
W.D. New York.

Dec. 15, 1995.

David Leven, Stephen Latimer, Prisoners' Legal Services, New York City, for plaintiffs.

Charles D. Steinman, Assistant Attorney General, Rochester, New York, for defendants.

### DECISION AND ORDER

LARIMER, District Judge.

This case is a class action under 42 U.S.C. § 1983 brought by inmates in protective-custody status in correctional facilities administered by the New York State Department of Correctional Services ("DOCS"). The case was eventually settled and was dismissed in 1991, with the stipulation that the dismissal was without prejudice to plaintiffs moving for attorney's fees. Plaintiffs have now moved for an award of fees pursuant to 42 U.S.C. § 1988. Defendants oppose the motion.

### BACKGROUND

The case was originally filed by a number of inmates *pro se*. They sought a number of changes in their privileges and living conditions.

In 1976, the Prisoners Legal Rights Project of the Legal Aid Society of New York City assumed representation of the plaintiffs. An amended complaint was filed in February 1977, and a class was certified in March 1977.

Prisoners' Legal Services ("PLS") was substituted as counsel for plaintiffs in 1981. The two attorneys for whom fees are sought on this motion are both PLS attorneys.

In January 1985, the parties began settlement negotiations. Although some areas of agreement emerged, there were disputed matters and the parties continued with discovery.

In November 1985, plaintiffs deposed Philip Coombe, the then-Deputy Commissioner of DOCS. At one point, he stated that because he had found there to be "some inconsistency" in the operation of the Protective Custody Units at different facilities, "four or five months [before the deposition], long before [he] ever heard of this case," he had [sat down and started piecing together what it is that [DOCS was] doing to make it more consistent." Affidavit of Charles D. Steinman, Esq. (Item 195) Ex. A at 11. When asked whether he had "been developing some kind of plans to make changes in the facilities Protective Custody Units' operations," he stated that he had. Steinman Aff. Ex. A at 12. He stated that his intention was to speak with various facility superintendents and then "make recommendations to the Commissioner and other Deputy Commissioners as to perhaps some standardizing of the operating of our units." Steinman Aff. Ex. A at 13.

In February 1986, Judge Michael A. Telesca (who was then presiding over the case) scheduled a pretrial conference. He directed plaintiffs' counsel to prepare a list of settlement demands to dispose of the case. Plaintiffs' counsel did so by letter dated March 6, 1986. *See* Affidavit of David C. Leven, Esq. (Item 193) Ex. D.

Defendants' then-counsel, Charles D. Steinman, Esq., responded by letter to the court dated March 26, 1986. In it, he stated that "[a]s I have indicated to the Court and plaintiffs' counsel previously, it is my expec-

tation that the new Departmental Directive on Protective Custody units will have a direct impact on a number of the relevant issues in this case." *See* Leven Aff. Ex. E.

Eight months later, on November 6, 1986, DOCS issued Directive 4948. The directive addressed many of the items listed in plaintiffs' settlement demand, such as family visits, recreational time, educational programs, etc. *See* Leven Aff. Ex. F.

Based on the new directive, counsel for both sides engaged in further settlement discussions. Some years went by as plaintiffs' counsel interviewed class members about the new policies, and the two sides worked out some remaining areas of dispute that were not specifically covered by Directive 4948. Eventually counsel agreed upon a stipulation of dismissal, which was filed on June 4, 1991.

Plaintiffs now move for $60,932.50 in attorney's fees. This figure represents 225.4 hours of work by Stephen M. Latimer, Esq., at $175 per hour, and 143.25 hours of work by David C. Leven, Esq., at $150 per hour. All the work for which compensation is sought was performed since January 1985; Latimer was not with PLS before December 1984, and Leven has no contemporaneous time records before 1985. *See* Declaration of Stephen M. Latimer (Attached to Motion for Attorney's Fees) ¶ 2.

## DISCUSSION

### I. Timeliness of Motion

Defendants oppose plaintiffs' fee request on several grounds. First, defendants contend that the motion is untimely. Defendants concede that there is no time limit as such for fee motions under § 1988, but, relying upon *Baird v. Bellotti*, 724 F.2d 1032 (1st Cir.), *cert. denied*, 467 U.S. 1227, 104 S.Ct. 2680, 81 L.Ed.2d 875 (1984), they argue that the motion should be denied because the delay here is unreasonable, and because it creates actual prejudice to defendants.

In response, plaintiffs explain that they waited until 1995 to move for attorney's fees because PLS has been involved in other litigation with DOCS involving issues similar to those in the case at bar. One of those cases, *Pease v. Coughlin*, No. 84–688 (N.D.N.Y.),

was not settled until February 1995. Plaintiffs contend that they feared that if they moved for attorney's fees in the instant case while the other litigation was pending, defendants might be more reluctant to settle the other cases; defendants might have chosen to try those cases in the hope that they would prevail on the merits and thus avoid having to pay any fees.

Although the lapse of time here between the entry of judgment and the motion for fees was unusually lengthy, I find on these facts that the delay does not justify denial of the fee request. First of all, the Stipulation of Dismissal specifically provided that dismissal could be entered "without prejudice to plaintiffs making, and defendants opposing, an application for Attorneys Fees." Leven Aff. Ex. G. No schedule or limitation was set for plaintiffs making such a motion. Defendants may have harbored the hope that no fee application would be made after some time passed, but they had been put on notice that such a motion could be filed and plaintiffs never made any representations to lull defendants into destroying whatever material was necessary to defend such a motion.

Plaintiffs' "strategy" of delay so as not to affect other cases might not carry the day here if there was true prejudice to defendants because of the four-year delay in seeking fees. But, in light of the agreement between the parties that plaintiffs could seek fees, the reason for the delay is less important than whether defendants actually suffered any prejudice because of it.

Based on my review, I do not see any prejudice to defendants occasioned by the delay here. As defendants recognize, the real concern here is not delay *per se*, but whether that delay has "unfairly surprise[d] or prejudice[d]" defendants. *See White v. New Hampshire Dep't. of Employment Security*, 455 U.S. 445, 454, 102 S.Ct. 1162, 1168, 71 L.Ed.2d 325 (1982) (holding that motion for fees under § 1988 is not subject to ten-day time limit of Fed.R.Civ.P. 59(e)). The court in *Baird*, the case relied upon by defendants, also stated that "prejudice remains a significant factor" under the Supreme Court's decision in *White*. The court held

that even though the moving party's delay was both "unreasonable" and "unjustified—counsel was simply too busy to be bothered," *id.* at 1036, the fees should still have been awarded because the non-moving party had not demonstrated any prejudice. *Id.*

Defendants contend that they have been prejudiced by the delay primarily because former defense counsel's memory of the relevant events has faded.[1] They also contend that most of his case file has been purged because of the lack of activity in the case.

For purposes of this motion, however, I am not convinced that these matters relating to counsel's memory and case file are especially relevant. The chief issue in dispute here is whether plaintiffs "prevailed" in this litigation in the sense that the instant lawsuit was a catalyst in bringing about DOCS's issuance of Directive 4948. Issues relating to the merits of the case, possible defenses, and so on, as to which defense counsel's recollections could be valuable, are not really central to this motion for fees.

Nor is this case like *Baird*, in which the court affirmed the denial of a party's request for fees (a different party than the one referred to above) because the nature, quality and amount of services rendered by the attorney for the moving party were significant issues, and opposing counsel's memory in that regard had greatly diminished. 724 F.2d at 1034–35. Although defendants here contend that some of the hours claimed are excessive, the work for which compensation is claimed is well-documented, and in my view the record is fully adequate for the court to decide whether portions of the hours claimed are excessive or duplicative.

As stated, the main dispute here concerns the effect, if any, that this litigation had on DOCS's decision to issue new directives concerning many of the matters that gave rise to this suit. Defendants have not identified what sort of materials are necessary, but lacking, to address that issue, and indeed, defendants themselves have submitted an excerpt from a deposition of a DOCS official

relating to the background of the new Directive. The sequence of events, the demands made by plaintiffs in their complaint and during the settlement negotiations, and the contents of Directive 4948, are all matters of record, and provide a sufficient basis for the court to evaluate whether plaintiffs should be considered prevailing parties in this lawsuit.

## II. Whether Plaintiffs Are "Prevailing Parties"

█ Section 1988 authorizes the court to award attorney's fees to a "prevailing party." Defendants argue that plaintiffs did not "prevail" in this case because, even though Directive 4948 gave plaintiffs much of what they sought in the litigation, there was no causal connection between the lawsuit and the directive. Defendants contend that DOCS would have issued the directive regardless of whether this case existed, and that it was little more than coincidence that the directive addressed many of plaintiffs' demands.

Plaintiffs claim that there was certainly a connection between this suit and Directive 4948. They contend that this action, together with two other contemporaneous class actions in the Northern District of New York, was a "catalyst" in bringing about the issuance of the new directive.

█ In *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the Court defined a prevailing party as one who "succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Id.* at 433, 103 S.Ct. at 1939. That success can result from the defendant's voluntary change of policy, so long as the change was prompted by the lawsuit. "It is a settled matter that, where attorney's fees are permitted, and where a lawsuit provided the 'catalyst' for the sought policy change, the plaintiff may be considered to have 'prevailed' and attorney's fees may be justified." *Rodonich v. Senysh-*

---

1. Charles D. Steinman, Esq., who represented defendants at the time of the settlement and dismissal, still represented defendants at the time the attorney's fee motion was filed, and he filed the opposing papers. He left the Attorney General's Office after all the papers had been submitted.

*yn,* 52 F.3d 28, 33 (2d Cir.1995) (citing *Hewitt v. Helms,* 482 U.S. 755, 760–61, 107 S.Ct. 2672, 2675–76, 96 L.Ed.2d 654 (1987)).

■ For plaintiffs to be entitled to fees under this "catalyst" theory, "there must be a causal connection; that is, the lawsuit must be ' "a catalytic, necessary, or substantial factor in attaining the relief." ' " *Marbley v. Bane,* 57 F.3d 224, 234 (2d Cir.1995) (quoting *Koster v. Perales,* 903 F.2d 131, 135 (2d Cir.1990). Thus, while "governments may change a policy without paying a toll or tribute to persons who advocated that policy change in court," *Marbley,* 57 F.3d at 234, "a plaintiff whose lawsuit has been the catalyst in bringing about a goal sought in litigation, by threat of victory (and not by dint of nuisance and threat of expense), has prevailed for purposes of an attorney's fee claim ..." *Id.* at 234–35.

■ Plaintiffs also need not obtain a judgment on the merits in order to prevail. It is well-established that a plaintiff who secures relief through settlement rather than court judgment may still be deemed a prevailing party. *See Koster,* 903 F.2d at 134. In fact, the Second Circuit has recently held that a plaintiff can be considered to have prevailed "even though the result [*i.e.* the defendant's change of position] has not been reduced to a judgment, consent decree, or settlement." *Marbley,* 57 F.3d at 235. All that is necessary is that the defendant have changed its position because of the lawsuit. *Id.* at 234.

In the case at bar, I believe that the record shows that this action was a catalyst with respect to DOCS's adoption of many of the policies embodied in Directive 4948. I therefore find that plaintiffs are prevailing parties for purposes of § 1988.

A comparison of plaintiffs' list of settlement demands prepared in March 1986 and the policies adopted in Directive 4948 is revealing. Of the seventeen specific items mentioned in plaintiffs' settlement demand, all but four were addressed in some fashion in the new Directive. Moreover, while not every demand was fully met, for the most part plaintiffs obtained at least some, and sometimes all, of what they wanted. For example, plaintiffs had demanded "[t]ime out

of cell," including "passive recreation on the gallery" and use of the gallery television, and daily showers. Leven Aff. Ex. D. The Directive stated that inmates would have at least three hours a day of out-of-cell time, including gallery or yard recreation, that "[g]allery recreation will include opportunities for inmates to ... watch television," among other things, and that out-of-cell time could be used to take showers. Leven Aff. Ex. F. Similarly, plaintiffs had demanded "[r]einstatement of Family Reunion Program" and "[r]einstatement of the phone home program ..." The Directive provided that "inmates in Protective Custody Status will be permitted to participate in the telephone home program," and that they would "be eligible to apply for participation in the Family Reunion Program ..." Many of the other demands were similarly addressed in the Directive.

Although the Directive does not expressly mention this litigation (and there was no reason why it should have), the correlation between its provisions and plaintiffs' demands in this lawsuit is obvious, and in my view gives rise to a strong inference that this litigation had a definite connection to the issuance of Directive 4948. Although the Directive did not give plaintiffs everything they had asked for, that is not necessary for plaintiffs to be deemed prevailing parties under § 1988. All that is required is that plaintiffs "achieve[d] some of the benefit [they] sought in bringing suit." *Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939. Clearly, plaintiffs did so here.

The stipulation of dismissal in this case stated that the action would be dismissed because, *inter alia,* "defendant Coughlin issued Directive 4948 governing the minimum conditions of confinement for inmates in Protective Custody status ...," and that "the policies announced in Directive 4948 ... altered many of the policies and practices previously in effect in the Protective Custody Unit ..." Leven Aff. Ex. G. Although the stipulation expressly stated that it was neither an admission by defendants nor a finding by the court of any wrongdoing on defendants' part, that is a common provision in settlement agreements and does not alter the

fact that defendants' change of policies during the pendency of this lawsuit bore a strong correlation to plaintiffs' demands. As plaintiffs note, defendants engaged in litigation under a statute with a fee-shifting provision "are usually reluctant to concede" that the litigation caused them to alter their position in any way. *Vitale v. Secretary of H.H.S.,* 673 F.Supp. 1171, 1175 (N.D.N.Y. 1987) (quoting *Posada v. Lamb County, Texas,* 716 F.2d 1066, 1072 (5th Cir.1983)).

Defendants place particular importance on the deposition testimony of then-Deputy Commissioner Philip Coombe that he had begun the process that led to the new Directive "four or five months" before his deposition, "long before [he] ever heard of this case ..." I do not find that sufficient to overcome the plain connection between the provisions of the Directive and the relief sought in this action. For one thing, Coombe stated that what prompted him to review the protective-custody policies was there was "some inconsistency" among the various facilities. The Directive that was ultimately issued, however, clearly is aimed not just at standardizing procedures and policies, but with providing inmates certain rights and privileges that did not exist before. Many of those rights and privileges had been sought in the lawsuit.

Furthermore, it strains credulity to believe that Coombe and other DOCS officials were unaware of this state-wide class action before Coombe's deposition in November 1985. The suit challenging the status of inmates in protective custody had been pending for almost 10 years. It is hard to imagine that state officials charged with administering the prisons would have been ignorant of such a suit for so long. Nevertheless, even if I were to accept Coombe's deposition testimony in November 1985 that he had been "reviewing" the policies at the various state institutions prior to learning of the lawsuit, it remains a fact that Directive 4948 was not issued until almost a year after Coombe's deposition, in November 1986. Even assuming that Coombe did not learn about this suit until very shortly before his deposition, he *was* aware of the suit for over a year before the issuance of the Directive.

I cannot accept defendants' contention that it was just "coincidence" that Directive 4948 mirrored many of plaintiffs' settlement demands. The clear inference that must be drawn is that this lawsuit was, in part, a motivating factor in DOCS' decision to adopt Directive 4948 and to change or clarify its policies toward inmates in protective custody. As such, plaintiffs have demonstrated that they obtained "some of the benefit" that they sought in bringing suit and, therefore, may be denominated a prevailing party for purposes of § 1988.

### III. Hourly Rates

Defendants also object to the amount of the fee requested, contending that both the hourly rates and the number of hours claimed are excessive. Defendants maintain that the hourly rates of $175 and $150 are higher than prevailing rates within this district, and that work performed more than three years ago should be compensated at unadjusted "historic" rates prevailing at the time in question.

Although the Second Circuit has endorsed the use of historic rates in "protracted" cases, *see New York Ass'n for Retarded Children v. Carey,* 711 F.2d 1136, 1152–53 (2d Cir.1983), it has not, as defendants' brief states, directed that such rates "must be used for services rendered more than three years prior to the application." Defendants' Memorandum of Law at 10–11. The court in that case stated that while "[n]either historic nor current rates are ideal," cases that have lasted many years may be divided into two phases, with the historic rate used for the earlier phase and the current rate for the later period. *Id.*

More recently, however, in *Missouri v. Jenkins,* 491 U.S. 274, 284, 109 S.Ct. 2463, 2469, 105 L.Ed.2d 229 (1989), the Supreme Court held that the district court has discretion to make "an appropriate adjustment for delay in payment—whether by the application of current rather than historic hourly rates or otherwise." Thus, after *Jenkins,* "a district court has the latitude to depart from the two-phase approach and may calculate all hours at whatever rate is necessary to compensate counsel for delay" in payment.

*Grant v. Martinez,* 973 F.2d 96, 100 (2d Cir.1992), *cert. denied,* 506 U.S. 1053, 113 S.Ct. 978, 122 L.Ed.2d 132 (1993).

In the case at bar, I believe that the use of historic rates is more appropriate. The services in question were performed years before the attorney's fee motion were made. Although courts have recognized that where there is a delay in payment, historic rates may undercompensate parties because they "do not reflect inflation or the cost of foregone interest," *New York State Ass'n of Retarded Children,* 711 F.2d at 1152, *see also Jenkins,* 491 U.S. at 283, 109 S.Ct. at 2469, the use of current rates may also result in a windfall because prevailing market rates for attorney's fees may rise at rates higher than inflation. *New York State Ass'n of Retarded Children,* 711 F.2d at 1152–53; *see also Saulpaugh v. Monroe Community Hosp.,* 4 F.3d 134, 146 (2d Cir.1993) (district court did not abuse discretion in applying average historic rate in order to avoid awarding defense counsel "a windfall due to the protracted nature of the litigation"), *cert. denied,* —— U.S. ——, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994).

Here, there has been a delay in payment, but that delay is attributable to plaintiffs' attorneys' decision to wait until 1995 to move for attorney's fees. Although I have found that it was not unreasonable for them to do so, the fact remains that it was their decision, made for purposes of strategy in another case. They should not receive a windfall as a result of that decision.

Nevertheless, bearing in mind that all of the hours claimed here date from 1985 and later, I find that the rates requested are not out of line with historic rates for experienced attorneys in complex civil rights litigation within this district. On August 21 1991, for example, I issued a decision in *Holmes v. Sobol,* 690 F.Supp. 154 (1988), awarding an attorney fees under § 1988 at the rate of $150 per hour. Two other attorneys received fees at the rates of $125 and $100 per hour (all three rates were those requested in the motion). The attorneys' work in that case was mostly performed from 1988 to 1990. In making the award, I noted that the first attorney had over fifteen years' experience in litigation, and that plaintiffs had submitted affidavits from two other local attorneys indicating that attorneys with that level of experience earned from $150 to $200 per hour for specialized litigation in federal court. *Id.* at 11.

Also, in *United States v. City of Buffalo,* 770 F.Supp. 108 (W.D.N.Y.1991), Judge John T. Curtin of this district, though declining to award fees at the requested rate of $225 to $275 per hour, awarded fees at an hourly rate of $175. The bulk of the work there seems to have been performed in the late 1980s; *id.* at 109. Noting that the attorney in question was "well qualified and experienced," *id.* at 110, Judge Curtin stated that $175 per hour was "the appropriate rate that would be charged in this community for work of similar competence." *Id.* at 115. Again, less-experienced attorneys received lower rates. *Id.*

In the case at bar, both attorneys are highly qualified and had many years' experience by the time they became involved in this lawsuit. Attorneys Latimer and Leven have been practicing law since 1968 and 1969 respectively, and both have extensive experience in civil rights litigation, including prisoners' civil rights actions. Leven has been Executive Director of PLS since 1979, and Latimer was the Senior Litigation Attorney during this suit. It should also be noted that the case was complex in a number of respects, and required competent experienced attorneys. I conclude, therefore, that the requested rates are reasonable historic rates for the nature and competence of the work performed.

### IV. Number of Hours Claimed

Defendants also contend that the hours for which plaintiffs request compensation are excessive. Specifically, defendants contend that the hours spent on traveling from counsel's offices in New York City to Rochester should not be compensated because this case could have been handled by an attorney from PLS's Buffalo office. Defendants also argue that plaintiffs should not be compensated for both attorneys' presence at depositions on four dates, since one attorney would have sufficed. Third, defendants maintain that "a number of other entries [in counsel's time

records] are too vague to permit an evaluation of their reasonableness." Defendants' Memorandum of Law at 12.

■ I do believe that some reduction is warranted. With respect to the travel costs, I am not persuaded that this time should be completely disallowed on the grounds that counsel was from New York City. For one thing, part of the reason that a Buffalo attorney did not handle the case was that one of the PLS attorneys at that office was a former clerk to Judge Curtin, who presided over this case until 1985. The case was therefore handled by downstate attorneys to avoid any risk or appearance of a conflict of interest, which was certainly reasonable. Furthermore, some of the travel here was to Albany, which would have taken as long or longer to reach from Buffalo.

■ Nevertheless, I do agree with defendants that it is appropriate to compensate travel time at a lower rate. *See, e.g., Davis v. City of New Rochelle,* 156 F.R.D. 549, 559 (S.D.N.Y.1994) (rates for travel reduced by 50%); *Loper v. New York City Police Dep't,* 853 F.Supp. 716, 721 (S.D.N.Y.1994) (same); *Jennette v. City of New York,* 800 F.Supp. 1165, 1170 (S.D.N.Y.1992) (same).

In fact, a substantial portion of the requested time relates to travel. It appears from Latimer's records that he spent approximately 94 hours in travel out of the 225.4 hours claimed. Although attorney Latimer's time records specify the time spent traveling, Leven's records are less exact, and give only a total number of hours on all activity for each day. For example, the entry for March 22, 1985 lists ten hours for "travel; conference with Telesca; meet with Steinman." Their time records also show that they did not always travel together, so Latimer's records cannot simply be applied to Leven. *See, e.g.,* Leven Time Records, entry for Oct. 15, 1985 (11 hours "trip to Great Meadow for depositions and inspection"). Based on the records available, I estimate Leven's travel time to be about 50 hours which includes one trip to Great Meadow "for depositions and inspection" on October 15, 1985. Some reduction is appropriate for all this travel time, and I believe that the rates should be reduced by 50 percent. Therefore, plaintiffs

are entitled to recover $11,975.00 for a total of 144 hours of travel by attorneys Leven and Latimer.

■ Regarding the depositions, "prevailing parties are not barred as a matter of law from receiving fees for sending a second attorney to depositions ..." *New York State Ass'n for Retarded Children,* 711 F.2d at 1146. Nevertheless, where two attorneys appear at a deposition on behalf of a single set of clients, they have some burden to show "that each had a distinct responsibility in the case necessitating his or her presence ..." *Kronfeld v. Transworld Airlines, Inc.,* 129 F.R.D. 598, 604 (S.D.N.Y.1990). *Cf. Williamsburg Fair Housing Committee v. Ross–Rodney Housing Corp.,* 599 F.Supp. 509, 518 (S.D.N.Y.1984) (plaintiffs compensated for multiple attorneys' presence at depositions and hearings, since plaintiffs plausibly showed that "when more than one attorney was present, each attorney made a distinct contribution by his presence or participation").

■ Although plaintiffs make reference to the complexity of the case, they have not identified any particular circumstances necessitating that they both attend the depositions in question. As noted, both attorneys are well-experienced litigators, and this was not a case in which they found themselves "confronted with a bevy of hostile lawyers ... on the other side ..." *Seigal v. Merrick,* 619 F.2d 160 (2d Cir.1980).

I recognize, however, that as a practical matter, "division of responsibility may make it necessary for more than one attorney to attend activities such as depositions and hearings." *Williamsburg,* 599 F.Supp. at 518. Indeed, "[t]wo lawyers are the minimum in much private litigation." *Bohen v. City of East Chicago,* 666 F.Supp. 154, 157 (N.D.Ind.1987). Rather than disallow one attorney's hours completely for these depositions, then, I believe that here, too, it would be more appropriate simply to address the relative lack of a demonstrated need for two attorneys at the depositions through a reduction of the total time compensated.

■ I also agree with defendants that counsel's time records do not always identify with precision what the nature or subject was of the work performed. For instance, both attorneys' records contain a number of entries for meetings and discussions with each other, without explanation of what was discussed. Thus, there is no way for the court to determine whether this time was reasonably spent.

These deficiencies in plaintiffs' fee request, though relatively minor, do support some reduction in the amount of time to be compensated. However, for the reasons stated, it would not be practicable to attempt to identify specifically which hours should or should not be included in the award.

" '[C]ourts have recognized,' in civil rights cases in which prevailing parties submit voluminous fee applications in an effort to recoup reasonable fees, 'that it is unrealistic to expect a trial judge to evaluate and rule on every entry in an application.' " *Terrydale Liquidating Trust v. Barness*, No. 82 CIV 7920, 1987 WL 9694 at *5, 1987 U.S.Dist. LEXIS 2944 *10 (S.D.N.Y. Apr. 15, 1987) (quoting *New York State Ass'n For Retarded Children*, 711 F.2d at 1146). For that reason, many "courts have endorsed percentage cuts as a practical means of trimming fat from a fee application." *New York State Ass'n for Retarded Children*, 711 F.2d at 1146; *see, e.g., Copeland v. Marshall*, 641 F.2d 880, 903 (D.C.Cir.1980) (en banc) (22% cut); *Ross v. Saltmarsh*, 521 F.Supp. 753, 761–62 (S.D.N.Y.1981) (5% and 10% cuts), *aff'd.*, 688 F.2d 816 (2d Cir.1982); *Kane v. Martin Paint Stores, Inc.*, 439 F.Supp. 1054, 1056 (S.D.N.Y.1977) (10% cut), *aff'd.*, 578 F.2d 1368 (2d Cir.1978).

The percentage reduction allows a court which is familiar with a protracted litigation to implement a finding that matters have been approached excessively or without sufficient attention to the problem of duplicative effort.

Rather than attempt to "identify and justify each disallowed hour," then, or to "announce what hours are permitted for each

legal task," *Mares v. Credit Bureau of Raton*, 801 F.2d 1197, 1202 (10th Cir.1986), a process which "would quickly become odious" and which could easily "descend to a contest between court and counsel, with counsel insisting that his or her integrity is being impugned every time the court questions the number of hours logged for a given day or a particular task," *id.* at 1203, I find it more appropriate to reduce the total number of hours requested for non-travel items by 15 percent. On the basis of the record, I believe that this reduction fairly reflects the occasionally inadequate documentation and the lower rate of compensation appropriate under the circumstances described above.

Applying this reduction, then, the hours compensated for work done by Stephen M. Latimer, Esq., are reduced from 131.4[2] hours to 111.69 hours, at a rate of $175 per hour, for a total of $19,545.75 The hours compensated for work performed by David C. Leven, Esq., are reduced from 93.25 hours to 79.26 hours, at a rate of $150 per hour, for a total of $11,889.00. The amount of the fee award to plaintiffs is $31,435.00, for work not related to travel. The total award then to plaintiffs, including travel related fees, is $43,410.00.

### CONCLUSION

Plaintiff's motion for attorney's fees (Item 192) under 42 U.S.C. § 1988 is granted in part. Plaintiffs are awarded attorney's fees in the amount of $43,410.00. That amount shall be paid by defendants within thirty (30) days of the date of entry of this Order.

IT IS SO ORDERED.

---

**2.** 131.4 hours are obtained by subtracting the 94 travel hours from the total claimed hours of 225.4. Similarly, Leven's 93.25 hours are obtained by subtracting the 50 travel hours from the total claimed hours of 143.25.