Aaron SABATINI, Sharon Sabatini, individually and as parent of Aaron Sabatini, Plaintiffs,

v.

CORNING–PAINTED POST AREA SCHOOL DISTRICT, Defendant.

No. 99–CV–6550L.

United States District Court, W.D. New York.

Sept. 26, 2001.

Bruce A. Goldstein, Bouvier & O'Connor, Buffalo, NY, for Plaintiffs.

James F. Young, Sayles, Evans, Brayton, Palmer & Tifft, Elmira, NY, for Defendant.

## DECISION AND ORDER

LARIMER, Chief Judge.

On December 29, 1999, this court issued a Decision and Order granting a preliminary injunction in favor of the plaintiffs in this action under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, directing defendant, Corning–Painted Post Area School District ("the District"), to provide plaintiff Aaron Sabatini ("Aaron") with a free appropriate public education ("FAPE"), as required by IDEA. *Sabatini v. Corning–Painted Post Area Sch. Dist.*, 78 F.Supp.2d 138 (W.D.N.Y.1999). The parties subsequently entered into a settlement agreement, which provided, *inter alia*, that the District would remit $22,000 on Aaron's behalf to Mitchell College ("Mitchell") for tuition and costs during the 2000–01 academic year, and that upon Aaron's successful completion of the Fall 2000 and Spring 2001 semesters at Mitchell, the District would issue him a high school diploma. The settlement agreement was incorporated into a Consent Order dismissing the action on June 21, 2000.

Pursuant to the terms of the settlement agreement, which reserved to plaintiffs (Aaron and his mother Sharon Sabatini) the right to seek reasonable attorney's fees, plaintiffs have now moved for an award of attorney's fees and costs in the amount of $58,937.65, under 20 U.S.C. § 1415(i)(3)(B), which provides that "[i]n any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents of a child with a disability who is the prevailing party." The District acknowledges that as prevailing parties, plaintiffs are entitled to an award of fees, but opposes certain aspects and portions of plaintiffs' request.

## DISCUSSION

### I. "Rates Prevailing in the Community"

The first area of dispute concerns the hourly rates sought by plaintiffs' attorneys. The attorneys in question, all of whom are or at the relevant times were with the law firm of Bouvier, O'Connor, in Buffalo, New York, are: Bruce A. Goldstein, Esq., a partner; Arthur H. Ackerhalt, Esq., also a partner; Jay C. Pletcher, an associate; and Linda Hassberg, Esq.[1] The hourly rates requested are as follows:

---

1. It is not clear what position at Bouvier, O'Connor was held by Hassberg, whose claimed time amounts to 1.9 hours.

| Attorney | 1998 | 1999 | 2000 |
|----------|------|------|------|
| Goldstein | $225 | $230 | $235 |
| Ackerhalt | n/a | $185 | $195 |
| Pletcher | $120 | $135 | $150 |
| Hassberg | n/a | $135 | n/a |

In addition, plaintiffs seek fees for work performed by a paralegal, at $65 per hour in 1998 and 1999, and $70 per hour in 2000. Rates for travel time are roughly half of those for legal work.

Defendant contends that plaintiffs have failed to provide any evidence, other than their own bills for services, of the reasonableness of the rates sought. In the absence of such evidence, defendant requests that the court calculate plaintiffs' fee award based on the rates customarily charged by defendant's counsel's firm, Sayles & Evans of Elmira, New York, for education-related work in the Southern Tier region of New York State. Those rates range from $85 per hour for associates to $150 per hour for partners.

 In determining a proper fee award under IDEA, courts should follow the "lodestar" approach, whereby the fee is derived "by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." *G.M. ex rel. R.F. v. New Britain Bd. of Educ.*, 173 F.3d 77, 84 (2d Cir.1999) (quoting *Blanchard v. Bergeron*, 489 U.S. 87, 94, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989)). What constitutes a reasonable rate is addressed in 20 U.S.C. § 1415(i)(3)(C), which provides that "[f]ees awarded under this paragraph shall be based on rates prevailing in the community in which the action

or proceeding arose for the kind and quality of services furnished. No bonus or multiplier may be used in calculating the fees awarded under this subsection." The fee applicant bears the burden of establishing that the requested rates meet this standard. *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (applying fee-shifting statute under Civil Rights Act, 42 U.S.C. § 1988)[2]; *P.G. v. Brick Township Bd. of Educ.*, 124 F.Supp.2d 251, 261 (D.N.J.2000); *S.D. v. Manville Bd. of Educ.*, 989 F.Supp. 649, 656 (D.N.J.1998).

 A threshold matter that must be addressed here is what constitutes the "community" referred to in the statute. Defendant suggests that the relevant community in this case is "Corning or the Southern Tier of New York," the geographical area in which this action arose. Defendant's Memorandum of Law at 5. Plaintiffs contend that the relevant community for determining a reasonable rate is the judicial district in which the trial court is located.

Case law from this circuit supports plaintiffs' position. The Second Circuit has stated that ordinarily, "the 'prevailing community' the district court should consider is 'the district in which the court sits' ...." *Cruz v. Local Union No. 3 of Intern. Broth. of Elec. Workers*, 34 F.3d 1148, 1159 (2d Cir.1994) (quoting *Polk v. New York State Dep't of Correctional Services*, 722 F.2d 23, 25 (2d Cir.1983)); *accord Luciano v. Olsten Corp.*, 109 F.3d 111, 115 (2d Cir.1997); *Marisol A. ex rel. Forbes v. Giuliani*, 111 F.Supp.2d 381, 386 (S.D.N.Y.

**2.** Courts have generally applied the principles and standards applicable to fee awards under § 1988 to cases involving fee requests under IDEA. *See, e.g., Holmes v. Millcreek Tp. Sch. Dist.*, 205 F.3d 583, 593 n. 12 (3d Cir.2000);

*Kathleen H. v. Massachusetts Dep't of Educ.*, 154 F.3d 8, 14 (1st Cir.1998); *Jodlowski v. Valley View Community Unit Sch. Dist. No. 365–U*, 109 F.3d 1250, 1253 n. 2 (7th Cir. 1997).

2000); *Ragin v. Harry Macklowe Real Estate Co.*, 870 F.Supp. 510, 518 (S.D.N.Y. 1994); *Catlin v. Sobol*, No. 86–CV–222, 1995 WL 363730 *2 (N.D.N.Y. June 7, 1995); *see also Stewart v. Barclay's Bus. Credit, Inc.*, 860 F.Supp. 150, 150 (S.D.N.Y.1994) ("our Court has traditionally applied the hourly rates of New York City practitioners in these matters, recognizing that the relevant community served is the entire Southern District of New York, and if a lawyer chooses to live and work within that district in a more salubrious place, or a cheaper one, that is his or her own personal choice") (citation omitted), *aff'd*, 54 F.3d 766 (2d Cir.1995). In this action, then, the court will deem the appropriate "community" for purposes of § 1415(i)(3)(C) to be the Western District of New York, and not simply the Corning area.

■ In addition, the Second Circuit has stated that if "special expertise of counsel from a ... [different] district [was] required," the court may take into consideration rates prevailing from that other district. *Cruz*, 34 F.3d at 1159. In some cases, then, due to the complexity of the case or the specialized nature of the legal services required, it may have been reasonably necessary for the fee applicant to seek out-of-town counsel because there were no available attorneys possessing the requisite degree of experience or expertise in the plaintiff's own area. In such cases, the term "community" should be construed more broadly, and rates may be based on those prevailing in the attorney's own geographical area for lawyers of similar skill performing work of similar complexity. *See, e.g., Mr. & Mrs. W v. Malito*, No. 92–1102, 1993 WL 764591 *2 (C.D.Ill. Apr.20, 1993) (since it was "clear that private special education lawyers are not generally available in this region or closer than Chicago, Illinois to advocate on behalf of the

parents' position," plaintiffs were "not bound by local hourly rates when there is no suggestion that the choice of counsel [from Chicago] was improvident or counsels' billing rates were out of line with those charged by available counsel of similar expertise, otherwise similarly situated").

In the case at bar, plaintiff Sharon Sabatini states in an affidavit that prior to securing representation by Bouvier, O'Connor, she "contacted numerous attorneys in Corning, Elmira and their surrounding areas, but was unable to secure an attorney with experience in the area of special education law." Affidavit of Sharon M. Sabatini (Ex. M to Affidavit of Bruce A. Goldstein (Docket Item 31)) ¶ 4. She states that she also contacted an attorney in Rochester, but he told her that he no longer practiced special education law and that he knew of no one in the Rochester area who did. *Id.* ¶ 7. Mrs. Sabatini eventually contacted Bouvier, O'Connor, some of whose attorneys, including Goldstein, Ackerhalt and Pletcher, concentrate in the area of disability rights, including special education for children with disabilities. Sabatini Aff. ¶¶ 10, 11; Goldstein Aff. ¶ 3. Thus, even if the court were otherwise inclined to consider Corning and its environs to be the relevant community, plaintiff's inability to locate an attorney in that area with a suitable background in special education law would make it inappropriate to base an hourly rate on the rates prevailing in and around Corning.

Defendant also contends that, regardless of what "community" is considered, plaintiffs have not provided adequate proof that the rates that they seek are in fact considered reasonable within that community. The fee applicant "normally satisfies this burden by submitting the affidavits of other attorneys in the relevant legal community, attesting to the range of prevailing

rates charged by attorneys with similar skill and experience." *Brick Township*, 124 F.Supp.2d at 261; *accord Mr. and Mrs. B v. Weston Bd. of Educ.*, 34 F.Supp.2d 777, 782 (D.Conn.1999); *Manville*, 989 F.Supp. at 656.

In their reply, plaintiffs have submitted affidavits of three attorneys (in addition to the affidavits of plaintiffs' attorneys themselves) in support of their motion. These affidavits are by: Melinda R. Saran, Esq., the Acting Associate Dean for Student Services at the University at Buffalo ("UB") Law School and a former clinical instructor and Supervising Attorney of the Special Education Law Clinic of the Legal Assistance Program at that school; Ronald M. Hager, Esq., a staff attorney in the Disability Rights Unit of Neighborhood Legal Services, Inc. in Buffalo; and H. Jeffrey Marcus, Esq., the current Supervising Attorney of the Special Education Law Clinic in Buffalo. Goldstein Aff. Exs. C, D and E. All of them state that they are familiar with Bouvier, O'Connor, and with the particular attorneys who represented plaintiffs in this action. All three also opine that the rates billed by plaintiffs' attorneys in this case are fair and reasonable in their community for the types of services performed here.

■ The affidavits of plaintiffs' attorneys, and their *curricula vitae*, indicate (and defendant does not appear to dispute) that they possess considerable experience and knowledge in the area of special education law. Goldstein has been an attorney since 1972, and has extensive experience litigating cases involving special education law and the rights of disabled persons. He is also the co-author of a treatise entitled *Legal Rights of Persons with Disabilities—An Analysis of Federal Law*, and for over a decade has taught a course at UB Law School entitled "Legal Rights of Persons with Disabilities." Goldstein Aff. Ex. A.

Ackerhalt obtained his Juris Doctor degree in 1973, and like Goldstein, he concentrates in special education law and related areas concerning the rights of persons with disabilities. Goldstein opines, and defendant has presented no evidence to the contrary, that he and Ackerhalt are "the two most experienced attorneys who concentrate in the private practice of special education law and the rights of persons with disabilities in the Western New York legal community." Goldstein Aff. ¶ 6.

Pletcher received his J.D. degree in 1995. He states that he has represented students and their families in the area of special education since then, mostly in impartial hearings, the first level of the administrative process.

Based on this evidence, I find that the rates requested are reasonable, and consistent with the rates prevailing in the community in which the action arose for the kind and quality of services furnished. I am not persuaded by defendant's contention that the court should base its award on the rates charged by defense counsel in their representation of school districts. As plaintiffs point out, there are a number of differences between attorneys representing school districts or boards of education and those representing plaintiffs in actions such as this one, not the least of which is that plaintiffs' attorneys frequently operate on a contingent-fee basis, whereas school attorneys are generally compensated for their services regardless of the outcome of a case. *See C.G. by Mr. and Mrs. G. v. New Haven Bd. of Educ.*, 988 F.Supp. 60, 68–69 (D.Conn.1997) (rejecting opposition to plaintiffs' fee request based on affidavits of attorneys who represented boards of education); *see also Brick Township*, 124 F.Supp.2d at 262 (noting that court had previously "rejected defendant's

argument for a lower rate based on the rate charged by school board attorneys").

These awards are also in line with previous fee awards in this district. *See, e.g., Haungs v. Runyon,* No. 96–CV–650, 2000 WL 1209381 *1 (W.D.N.Y. Aug.18, 2000) ("In this district, the billing rates for senior associates generally range between $110 and $205 per hour"); *Alnutt v. Cleary,* 27 F.Supp.2d 395, 399–401 (W.D.N.Y.1998) (rates of $160, $180 and $205 per hour for middle and senior level associates were commensurate with those prevailing in the community); *McPhatter v. Cribb,* No. 97–CV–0360E(F), 2000 WL 743972, at *3 (W.D.N.Y. May 25, 2000) (finding the hourly rates of $125 for a senior associate and $240 for a partner to be reasonable in the Buffalo legal market); *Greenway v. Buffalo Hilton Hotel,* 951 F.Supp. 1039, 1070 (W.D.N.Y.1997) (rates of $125 for senior associate and $200 for partner deemed reasonable), *aff'd,* 143 F.3d 47 (1998). Although Goldstein's rates are arguably slightly high in comparison with these cases, they are nonetheless reasonable in light of the specialized nature of his services and his expertise in the area of special education law. *See Blum v. Stenson,* 465 U.S. 886, 895 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) (a reasonable rate is one that is "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation"); *Angela L. v. Pasadena Ind. Sch. Dist.,* 918 F.2d 1188, 1197 (5th Cir.1990) (court may adjust figure based on a number of factors, including "the experience, reputation, and ability of the attorneys").

## II. When Did Plaintiffs "Prevail"?

■ The next area of dispute concerns the point at which plaintiffs became "prevailing parties" for purposes of § 1415. Defendant contends that plaintiffs did not become prevailing parties until May 20, 1999, when they made their second request for an impartial hearing. Defendant asserts that plaintiffs did not prevail as to their first hearing request on August 11, 1998, and that plaintiffs should therefore receive no fees relating to that first request. An analysis of this dispute requires some understanding of the sequence of events in this action.

On August 11, 1998, plaintiffs made their first request for an impartial hearing, *see* 20 U.S.C. § 1415(f), alleging that Aaron had been denied a FAPE since the 1994–1995 school year. In December 1998, however, before any hearing was held, the parties entered into a settlement agreement. Under the terms of that agreement, the District agreed to "actively engage in a search for a residential placement" for Aaron, and to "provide an appropriate educational program for Aaron during the 1998–99, 1999–2000, and 2000–2001 school years or until such time as Aaron receives a high school diploma, whichever comes first." Defendant's Answer Ex. A.

The District alleges that it attempted, but was unable, to find any residential placement that would accept Aaron. In early 1999, however, Mrs. Sabatini visited Mitchell, which has educational programs designed for students with disabilities. Aaron subsequently applied for admission to Mitchell, and was accepted there on April 8, 1999.

The District, however, refused to place Aaron at Mitchell, claiming that the New York State Department of Education had denied approval for the placement on the ground that Mitchell was a post-secondary school and not listed as an approved secondary special education school.

On May 20, 1999, plaintiffs again requested an impartial hearing, alleging that the District had failed to abide by the

terms of the December 1998 settlement agreement by failing to place Aaron at Mitchell. After holding a hearing on August 12, 1999, the Impartial Hearing Officer ("IHO") issued a decision in plaintiffs' favor on September 24, 1999. The IHO found that the District had not met its burden of proof that it had provided Aaron with a FAPE, and concluded that "[e]quity demands that the District place A[aron] at Mitchell in accordance with the parties' written [settlement] agreement." Complaint Ex. A.

Plaintiffs filed the complaint in this action on November 3, 1999, alleging claims under IDEA and other federal and New York statutes and the United States Constitution. As stated, the court granted plaintiffs' motion for a preliminary injunction on December 29, 1999, and directed defendant, *inter alia*, to: "implement the decision of Impartial Hearing Officer Joan B. Alexander, Esq., dated September 24, 1999; and place plaintiff Aaron Sabatini at Mitchell College in New London, Connecticut, pending further order of this court." *Sabatini*, 78 F.Supp.2d at 147.

■ Defendant concedes that plaintiffs are prevailing parties in this action, which they plainly are. "[P]laintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit.'" *New Britain*, 173 F.3d at 81 (quoting *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 789, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989)). "[T]he most critical factor is the degree of success obtained," *Texas State Teachers Ass'n*, 489 U.S. at 789, 109 S.Ct. 1486, which is determined by "compar[ing] the relief sought by the plaintiff with the relief obtained as a result of the suit." *New Britain*, 173 F.3d at 81 (citing *Christopher P. v. Marcus*, 915 F.2d 794,

804 (2d Cir.1990)). Here, plaintiffs obtained in this lawsuit precisely the relief that they sought: having Aaron placed at Mitchell so that he could receive a FAPE. There is no dispute, then, that plaintiffs are the prevailing parties here.

I am not persuaded by defendant's argument that plaintiffs should be awarded fees only for work performed on or after May 20, 1999, when plaintiffs made their second request for an impartial hearing. That argument is based on an artificial segmenting of the events leading up to this litigation, which were not entirely discrete and separate from each other, as defendant suggests. Rather, plaintiffs' first hearing request was part of a continuing series of events leading up to plaintiffs' ultimate success in this lawsuit, and it had a direct effect on subsequent proceedings both in this court and before the IHO.

First, although the District characterizes plaintiffs as having "backtracked" when they reached the initial settlement after their first hearing request, Defendant's Memorandum of Law at 7, certainly defendant's position changed much more substantially at that point than did plaintiffs'. Defendant notes that when they made their first request for a hearing, plaintiffs stated that they sought to have the District "immediately locate and secure a residential placement" for Aaron, whereas the first settlement agreement provided only that the District would "actively engage in the search for" such a placement. Affidavit of Jay C. Pletcher (Docket Item 28) Ex. F.

Nevertheless, the agreement clearly contemplated that the District would attempt to place Aaron in a residential program sooner rather than later, and in that sense it gave plaintiffs what they wanted. Moreover, the fact that the District even agreed to conduct such a search represented a change in its position. Twice before,

on June 22, 1998, and July 23, 1998, the District's Board of Education ("the Board") had rejected recommendations by the District's Committee on Special Education ("CSE") that Aaron receive schooling at a residential facility. The first time it did so, the Board also appointed a new CSE to consider plaintiffs' request a second time. On July 14, 1998, the new CSE also recommended a residential placement, but the Board rejected that recommendation as well. *Sabatini,* 78 F.Supp.2d at 139.

The agreement also provided for other relief for plaintiffs. It stated that the District would "provide an appropriate educational program for Aaron during the 1998–99, 1999–2000 and 2000–2001 school years or until such time as Aaron receives a high school diploma, whichever occurs first," and that the District would pay Aaron's parents "the sum of $3,063.68 as reimbursement for out-of-pocket expenses associated with their search for an appropriate residential placement for Aaron." Pletcher Aff. Ex. F.

The real significance of this settlement agreement, however, is perhaps best demonstrated by the reliance placed upon it by the IHO in her September 24, 1999 decision. She noted that in their request for an impartial hearing, Aaron's parents had specifically objected to "the District's failure ... to implement the terms of the [settlement] agreement," and to "the District's failure to ... implement that part of the settlement agreement requiring the District to actively engage in a search for a residential placement ...." Plaintiffs' Memorandum of Law Ex. A at 3, 4. She also stated that Aaron's "parents noted that, in spite of the District's responsibilities under applicable law *and the agreement,* the District did not implement A[aron]'s IEP [Individualized Education Plan] for the 1998–1999 school year and the District did not provide A[aron] with an IEP for the 1999–2000 school year." *Id.* at 5 (emphasis added).

The IHO also relied upon the agreement in reaching her conclusion that the District had not met its burden of proving that it had provided Aaron with a FAPE. She found "that Mitchell is an appropriate placement for A[aron] in light of the parties' agreement," and the other facts and circumstances presented. She noted that for the school years from 1998–1999 to 2000–2001, "the parties' agreement [that Aaron's IEP, which recommended residential placement, was appropriate for Aaron] is set forth in writing," and that "[e]quity demands that the District place A[aron] at Mitchell in accordance with the parties' written agreement." *Id.* at 8.

The IHO's decision in turn formed part of the basis for the instant lawsuit, as well as for this court's December 29, 1999 Decision and Order granting plaintiffs' motion for a preliminary injunction. Specifically, the court ordered the District to "implement the decision of Impartial Hearing Officer Joan B. Alexander, Esq., dated September 24, 1999 and place plaintiff Aaron Sabatini at Mitchell College ...." 78 F.Supp.2d at 147. In reaching that decision, the court noted that the IHO had found that Aaron was entitled to be placed at Mitchell, and that "the District itself, in the December 1998 settlement agreement, agreed to seek a residential setting for Aaron." *Id.* at 143. The court also stated that "the only administrative official who has yet rendered a decision in this matter-the IHO-has found that Mitchell *is* appropriate for Aaron," and that "[f]or me to deny plaintiffs' motion for a preliminary injunction, then, would require me to rule *contrary* to the most recent administrative ruling in this case." *Id.* at 146.

In light of this sequence of events, it becomes clear that defendant's contention

that plaintiffs did not "prevail" when they made their first request for an impartial hearing is specious, as it fails to take into account the direct connection between that request, the 1998 settlement agreement, and the decisions by the IHO and this court in plaintiffs' favor. The agreement itself states that it is meant to "settle all issues and claims which have been or could be asserted at the November 12, 1998 impartial hearing requested on behalf of Aaron Sabatini," Pletcher Aff. Ex. F. That agreement in turn formed a significant basis for the IHO's decision, and both the agreement and the IHO's decision were relied upon by this court in its decision to grant plaintiffs the relief they sought here.[3]

■ A separate, though related, issue, concerns plaintiffs' request for fees for services performed prior to plaintiffs' first hearing request on August 11, 1998. Some of these relate to CSE meetings that were held in May and July 1998. Defendant asserts that even if the court determines that plaintiffs are prevailing parties as to the first hearing request, the court should disallow all fees prior to August 11, 1998. Specifically, defendant objects to any award of fees relating to the May and July CSE meetings.

This issue involves the application of 20 U.S.C. § 1415(i)(3)(D)(ii), which provides in pertinent part that "[a]ttorneys' fees may not be awarded relating to any meeting of the IEP Team[4] unless such meeting is convened as a result of an administrative proceeding or judicial action ...." Defendants contend that this provision bars an award of fees for work related to the two CSE meetings in this case, because those meetings were not convened as a result of any administrative proceeding or judicial action. Defendants also cite authority that the " 'trigger point' for attorney's fees under the IDEA is generally a request for an impartial hearing." *Shanahan v. Board of Educ. of Jamesville–Dewitt Sch. Dist.*, 953 F.Supp. 440, 444 (N.D.N.Y.1997) (quoting *Anderson v. Board of Educ. of the Syracuse City Sch. Dist.*, 88–CV–122, 1989 WL 8664 (N.D.N.Y.1989)).

In response, plaintiffs state that they are not seeking fees related to the May 1998 CSE meeting; the first entry in plaintiffs' fee application is dated June 11, 1998. Although plaintiffs' papers do not expressly address the effect of § 1415(i)(3)(D)(ii), they appear to contend

---

**3.** At oral argument, counsel for the District cited *Buckhannon Bd. and Care Home, Inc. v. West Virginia Dep't of Health and Human Resources,* 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001), in support of the argument that fees should not be awarded for representation prior to the December 1998 settlement agreement. Defendant's reliance on *Buckhannon* is misplaced. The Supreme Court there held that the "catalyst theory," which posits that plaintiffs are prevailing parties if they achieve their desired result because the lawsuit brought about a voluntary change in the defendant's conduct, is not a permissible basis for an award of attorney's fees under fee-shifting statutes authorizing an award of fees to the prevailing party. The Court in *Buckhannon,* however, held only that the catalyst theory cannot be used to justify an award in the absence of any court-ordered

relief, such as a judgment on the merits or a court-ordered consent decree. 121 S.Ct. at 1841. In the case at bar, however, the court *did* issue an injunction in plaintiffs' favor, and as explained, plaintiffs' first request for an impartial hearing sowed the seeds for that ultimate judicial relief.

**4.** The IEP Team is a team composed of the parents of the child, a multi-disciplinary collection of appropriately qualified educational professionals, and, when appropriate, the child, *see* 20 U.S.C. § 1414(d)(1)(B), which develops a plan for the child. In New York State, the IEP Team is the CSE. *See Connors v. Mills,* 34 F.Supp.2d 795, 798 (N.D.N.Y. 1998); 20 U.S.C. § 1414(d)(1)(B); N.Y. Educ. L. § 4402(1)(b)(1).

that they should be compensated for work relating to the July meeting because it was conducted while the District's request for an impartial hearing was pending. The District had notified plaintiffs by letter dated June 15, 1998, that it was requesting an impartial hearing pursuant to 8 N.Y.C.R.R. 200.5(a)(1)(vi)(a), which permits a district to initiate an impartial hearing upon receiving a request for an independent evaluation. Plaintiffs had requested an independent evaluation on May 29, 1998, because of their disagreement with the District's prior evaluation of Aaron. The District withdrew its hearing request at the July 14 CSE meeting.

The apparent purpose of § 1415(i)(3)(D)(ii), which was added to § 1415 in 1997, was "to discourage attorney participation in routine IEP meetings," because the presence of attorneys in such situations could "contribute to an adversarial atmosphere that might inhibit the parties from working together to develop an agreeable plan." *F.R. v. Board of Educ., Plainedge Pub. Schools,* 67 F.Supp.2d 142, 147 (E.D.N.Y.1999). That view finds support in the legislative history of the amendment, which indicates that this provision was intended to keep the focus on the needs of the child through cooperative planning. The House Report states, "The [Education and the Workforce] Committee believes that the IEP process should be devoted to determining the needs of the child and planning for the child's education with parents and school personnel. To that end, the bill specifically excludes the payment of attorneys' fees for attorney participation in IEP meetings, unless such meetings are convened as a result of an administrative proceeding or judicial action." H.R.Rep. No. 95–105, at 105 (1997), *reprinted in* 1997 U.S.C.C.A.N. 78.

The court in *Plainedge,* however, went on to state that it could not "agree, however, that the amendment was intended to prohibit completely any award of attorneys fees in cases where the IEP meeting is held in direct response to an attorney's request for an impartial hearing. In such cases, the IEP meeting may have been convened to settle the parties' dispute and would likely not have been held at all, but for the attorney involvement." *Id.* I believe that this reasoning is sound and consistent with the purpose of § 1415(i)(3)(D)(ii), and that it applies in the instant case as well. This was not a case in which the parties had simply been discussing the best plan for Aaron's education, and agreed to hold an IEP meeting to attempt to work out a solution. Plaintiffs had expressed their disagreement with the District's evaluation of Aaron, and, through their attorneys, had requested an independent evaluation. The district then requested an impartial hearing, but dropped that request when the IEP meeting was held. None of this suggests any unnecessary or counterproductive attorney involvement, or that plaintiffs' attorneys' involvement at that stage made matters any more contentious or drew the parties' focus away from Aaron's education as the primary concern. The attorneys' involvement was due to an already-existing dispute between the District and Aarons' parents over the best plan for Aaron's education.

Moreover, since the District had requested an impartial hearing a month before the July CSE meeting was held, an administrative proceeding had been set in motion, and the hearing request "trigger point" had already been passed by the time of the July meeting. Defendant has not put forward any reason, and I see none, why the fact that the District, not plaintiffs, had made that hearing request should have any bearing on plaintiffs' enti-

tlement to fees with respect to that meeting.

### III. Reasonableness of Hours Expended

 The fee applicant has the burden to establish the reasonableness of the number of hours worked. *Hensley*, 461 U.S. at 433, 103 S.Ct. 1933, *Alnutt v. Cleary*, 27 F.Supp.2d at 399. The fee calculation should exclude hours that were not "reasonably expended" because they were "excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434, 103 S.Ct. 1933.

Defendant contends that there are numerous entries in counsel's billing records here that represent hours that were not "reasonably expended," and that the fee award should be reduced accordingly. In particular, defendant asserts that counsel's records indicate that there was duplicative work performed by plaintiffs' attorneys, that some entries are too vague to determine the reasonableness of the time claimed, and that there are some double entries in the records for the same work.

 It is true that fees can and should be reduced for duplicative work. *See, e.g., Berry v. New York State Dep't of Correctional Services*, 947 F.Supp. 647, 652 (W.D.N.Y.1996). Plaintiffs' attorneys, however, explain that they used a "team" approach in this case, with different attorneys working on different aspects of the case and the issues, depending on each attorney's individual area of expertise.

 After reviewing the time records submitted in support of the fee application, and the affidavits of plaintiffs' attorneys explaining the nature of the work that each lawyer performed, I find that some reduction in the number of hours is appropriate. The total time claimed here is 380 hours, which includes 29.7 hours of travel time and 5.2 hours by a paralegal. Even subtracting those figures, four attorneys worked on this case for a total of 345.1 hours, which is the equivalent of over eight and a half 40–hour work weeks. While I recognize that the District's own intransigence necessitated the expenditure of most of that time, I do believe that there was some duplication of effort here as well.

I understand that counsel took a "team" approach to this litigation and the prior proceedings, but though such an approach may have been effective, I am not convinced that it was always necessary or that it led to the most efficient use of time. For instance, Pletcher states in his affidavit that his "involvement at the impartial hearing and intimate knowledge of the facts of the case combined with Mr. Ackerhalt's experience in federal court necessitated both [their] appearances in Court" on December 22, 1999 when the court heard oral argument on plaintiffs' motion for a preliminary injunction. Pletcher Aff. ¶ 24. While plaintiffs or their attorneys might have *preferred* to have both Ackerhalt and Pletcher in court that day, that does not mean that it was reasonably necessary that they both attend, and presumably either one of them could have argued the motion alone. I believe that such duplication of effort warrants a modest reduction in the hours claimed. *See In re Bausch & Lomb, Inc. Securities Litigation*, 183 F.R.D. 78, 85 (W.D.N.Y.1998) (reducing lodestar by fifteen percent due to, *inter alia*, duplicative work); *Greenway v. Buffalo Hilton Hotel*, 951 F.Supp. 1039, 1069 (W.D.N.Y.1997) (disallowing certain claimed hours as duplicative), *aff'd as modified*, 143 F.3d 47 (2d Cir.1998); *Walker v. Coughlin*, 909 F.Supp. 872, 881 (W.D.N.Y. 1995) (reducing non-travel hours by fifteen percent to reflect duplication of effort).

 I also find that some of the entries in plaintiffs' counsel's time records do not

provide enough detail. Fees can be reduced where time entries are insufficiently detailed for the court to ascertain the nature of the work performed or whether the time claimed was reasonably expended. *See, e.g., G.M. v. New Britain Bd. of Educ.*, No. 3:96CV2305, 2000 WL 435577 *5 (D.Conn. Mar.8, 2000) (entries stating "preparation for hearing," "appeal analysis," "work on appeal brief," and "reply brief" did not give court an adequate basis on which to evaluate reasonableness of hours expended); *Mr. and Mrs. B. v. Weston Bd. of Educ.*, 34 F.Supp.2d 777, 781 (D.Conn.1999) ("Entries stating such vague references as 'review of file,' 'review of correspondence,' 'research,' 'conference with client,' and 'preparation of brief' do not provide an adequate basis upon which to evaluate the reasonableness of the services and hours expended on a given matter"); *Walker*, 909 F.Supp. at 881 ("counsel's time records do not always identify with precision what the nature or subject was of the work performed"); *Greenway*, 951 F.Supp. at 1069–70 ("certain entries on both counsels' time records do not always accurately identify what the nature or subject was of the work performed"); *Cefali v. Buffalo Brass Co.*, 748 F.Supp. 1011, 1021–22 (W.D.N.Y.1990) (finding that "plaintiff has not met his burden of accounting for his time with sufficient precision").

In this case, most of the entries are reasonably well-detailed and specific, and obviously it would be unrealistic and unduly burdensome to expect counsel to set forth in minute detail the precise work claimed in each entry. Nevertheless, in some instances the entries are insufficient: "hearing preparation"; "prepare for hearing"; "review records"; "telephone conference with client"; "prepare for discovery"; etc. Although counsel's affidavits shed a little additional light on some of these en-

tries, it is still not possible for the court to determine with a reasonable degree of certainty what type of work all these entries represent, or whether that time was reasonably expended.

Courts have recognized that in many cases in which prevailing parties seek an award of attorney's fees, "it is unrealistic to expect a trial judge to evaluate and rule on every entry in an application." *Walker*, 909 F.Supp. at 881 (quoting *Terrydale Liquidating Trust v. Barness*, No. 82 CIV 7920, 1987 WL 9694 at *5 (S.D.N.Y. Apr.15, 1987)). For that reason, many courts have endorsed percentage cuts "as a practical means of trimming fat from a fee application." *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1146 (2d Cir.1983); *see Walker*, 909 F.Supp. at 881 (collecting cases). "The percentage reduction allows a court which is familiar with a protracted litigation to implement a finding that matters have been approached excessively or without sufficient attention to the problem of duplicative effort." *Walker*, 909 F.Supp. at 881.

Rather than attempt to "identify and justify each disallowed hour," then, or to "announce what hours are permitted for each legal task," *Mares v. Credit Bureau of Raton*, 801 F.2d 1197, 1202 (10th Cir. 1986), a process which "would quickly become odious" and which could easily "descend to a contest between court and counsel, with counsel insisting that his or her integrity is being impugned every time the court questions the number of hours logged for a given day or a particular task," *id.* at 1203, I find it more appropriate to reduce the total number of hours requested for non-travel items by fifteen percent.[5] That reduction results in the following figures:

---

**5.** I have reviewed the documentation support-

ing the claim for 1.9 hours by Hassberg and

| Attorney | Non–Travel Time Claimed | Time After 15% Reduction |
|---|---|---|
| Pletcher | 49.1 hours (1998)<br>90.5 hours (1999)<br>43.6 hours (2000) | 41.7 hours (1998)<br>76.9 hours (1999)<br>31.5 hours (2000) |
| Ackerhalt | 108.7 hours (1999)<br>27.4 hours (2000) | 92.4 hours (1999)<br>23.3 hours (2000) |
| Goldstein | .7 hours (1998)<br>7.6 hours (1999)<br>15.4 hours (2000) | .6 hours (1998)<br>6.5 hours (1999)<br>13.1 hours (2000) |

Multiplying those times by the rates requested, which I have found to be reasonable, yields the following amounts:

**1998—**

| | | | |
|---|---|---|---|
| Pletcher | 41.7 hours @ $120/hr. | = | $5004.00 |
| Goldstein | .6 hours @ $225/hr. | = | $135.00 |

**1999—**

| | | | |
|---|---|---|---|
| Pletcher | 76.9 hours @ $135/hr. | = | $10,381.50 |
| Ackerhalt | 92.4 hours @ $185/hr. | = | $17,094.00 |
| Goldstein | 6.5 hours @ $230/hr. | = | $1495.00 |

**2000—**

| | | | |
|---|---|---|---|
| Pletcher | 31.5 hours @ $150/hr. | = | $4725.00 |
| Ackerhalt | 23.3 hours @ $195/hr. | = | $4543.50 |
| Goldstein | 13.1 hours @ $235/hr. | = | $3078.50 |
| **Subtotal** | | = | $46,456.50 |

**Other Compensable Amounts**

| | | | |
|---|---|---|---|
| Travel time | | = | $2416.75 |
| Hassberg | | = | $256.50 |
| Paralegal | | = | $349.00 |
| Disbursements | | = | $251.90 |
| **TOTAL FEES & COSTS** | | = | **$49,730.65** |

I conclude that this figure, $49,730.65, represents a fair and reasonable fee award in this case.

5.2 hours by a paralegal, and find those requests to be reasonable. The 15% reduction will not be applied to those claims.

In addition, with respect to defendant's contention that counsel's time records contain double entries for the same work, the only such entries that have not been adequately explained by plaintiffs' counsel are two entries for a telephone conference with the court on November 12, 1999, each of which is ascribed to Ackerhalt and listed as lasting .20 hours. That amount of time has been subtracted from Ackerhalt's hours in calculating the fee award.

## CONCLUSION

Plaintiffs' motion for attorney's fees (Docket Item 24) is granted in part.

Plaintiffs are awarded attorney's fees and costs in the amount of $49,730.65. That amount shall be paid by defendant within thirty (30) days of the date of entry of this Decision and Order.

IT IS SO ORDERED.